# CIRCUIT COURT UNITED STAT S.

## BALTIMORE, MAY, 1818.

*United States.*            ⎫ ROBBERY OF THE
vs.                         ⎬ MAIL, &c.
*Joseph Thompson Hare.*     ⎭

Present—Hon. *Gabriel Duval,* ⎱ Judges.
Hon. *James Houston,* ⎰

*William Wirt,* Attorney General of the United States'
*Elias Glenn,* District Attorney, *Thomas Kell,* and *Reverdy Johnson, Esqrs.* Counsel for the Prosecution.

Gen. *William Winder, David Hoffman, Charles Mitchell, Upton S. Heath,* and *Eben. L. Finley, Esqrs.* Counsel for the Prisoner.

In the Circuit Court of the United States of America' for the fourth circuit, held at the city of Baltimore, in and for the Maryland district.

*Maryland District,* TO WIT.—The grand inquest of the United States of America, for the fourth circuit, inquiring for the body of the Maryland district, upon their oaths, do present, that Joseph Thompson Hare, late of the said district, yeoman, together with a certain Lewis Hare, and a certain John Alexander, on the eleventh day of March, in the year eighteen hundred and eighteen, in the night of the same day, in the public highway at Harford county, at the district aforesaid, in and upon one David Boyer, then and there being the carrier of the mail of the said United States, and the person entrusted therewith, and in the peace of God and of the said United States, then and there being, with force and arms, at the district aforesaid, feloniously did make an assault, and him, the said David Boyer, in bodily fear and danger of his life in the highway aforesaid then and there did put, and with the use of certain dangerous weapons, to wit, pistols and dirks, which the said Joseph

Robbing the carrier of the mail of the U. States, or o-ther person entrusted therewith, of such mail, by stopping him on the highway, demanding the surrender of the mail, and at the same time showing weapons calculated to take his life, such as pistols or dirks, putting him in fear of his life, and

obtaining possession of the mail by the means aforesaid, against the will of the carrier, is such a robbing of the mail, and such a putting the life of the carrier or person entrusted therewith in jeopardy, by the use of dangerous weapons, as will bring the offence within the following terms of the 19th section of the act of congress of the 30th April, 1810, entitled "An act regulating the post office establishment," to wit; "or if in effecting such robbery of the mail, the first time, the offender shall wound the person having the custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death."

BALTI-
MORE
May, 1818.

United States
v.
Hare.

Standingmute on a charge of felony against the laws of the United States, is equivalent to a plea of not guilty.

Thompson Hare, then and there in his hands held, he, the said Joseph, did put in jeopardy the life of said David Boyer, he, the said David Boyer, then and there being entrusted with, and having the custody of the said mail of the said United States, and the mail aforesaid, so entrusted and in the custody as aforesaid of said Boyer, certain bank bills, letters, and packets to the jurors aforesaid unknown, belonging to certain persons to the jurors aforesaid unknown, from the personal custody and care of the said David Boyer, and against his will, in the highway aforesaid, at the district aforesaid, then and there feloniously and violently did rob, steal, take, and carry away, against the form of the statute of the said United States in such cases made and provided, and against the peace, government, and dignity of the said United States of America.

And the jurors aforesaid, upon their oaths aforesaid, do farther present, that the said Joseph Thompson Hare, together with the said John Alexander, and Lewis Hare, on the eleventh day of March, in the year aforesaid, in the night of the same day, in the public highway at Harford county, at the district aforesaid, in and upon David Boyer, he then and there being the carrier of the mail of the said United States, and the person entrusted therewith, and in the peace of God, and of the said United States, then and there being, with force and arms, at the district aforesaid, feloniously did make an assault, and him, the said David Boyer, in bodily fear and danger of his life, in the said public highway, then and there, and with the use of certain dangerous weapons to wit, pistols and dirks, which the said Joseph Thompson Hare then and there held in his hands, the said Joseph Thompson Hare did put in jeopardy the life of said David Boyer, then and there being entrusted with, and having the custody of said mail, and the said mail of the said United States from the custody, possession, and care of said David Boyer, and against the will of said David Boyer, in the highway aforesaid, at the district aforesaid, did then and there feloniously and violently rob, steal, take, and carry away, against the form of the statute of the said United States of America in such cases made and provided, and against the peace, government, and dignity of the said United States of America.

And the jurors aforesaid, upon their oaths aforesaid, do farther present, that the said Joseph Thompson Hare, together with the said John Alexander, and Lewis Hare, on the eleventh day of March, in the year aforesaid, in the night of the same day, at Harford county, in the district aforesaid, in the public highway, in and upon David Boyer, then and there in the peace of God and the said United States, being, and then and there being the carrier of the mail of the said United States. and the person entrusted therewith, at the district aforesaid, feloniously did make an assault, and him, the said David Boyer, then and there having the custody of the said mail of the said United States, in bodily fear and danger of his life then and there feloniously did put, and from the custody and possession of said David Boyer, and against the will of said David Boyer, in the highway aforesaid, at the district aforesaid, feloniously and violently did rob, steal, take, and carry away the said mail of the said United States, then and there containing sundry letters, bank bills, and packets, to the jurors aforesaid unknown, belonging

to certain persons to the jurors aforesaid unknown, contrary to the form of the statute of the said United States in such cases made and provided, and against the peace, government, and dignity of the said United States of America.

ELIAS GLENN.

*District Attorney of the United States for Maryland District.*

True Bill.　　JOHN STRICKER, Foreman.

BALTI-
MORE.
May, 1818.

United States
v.
Hare.

The grand jury having returned bills of indictment against the prisoner, John Alexander, and Lewis Hare, they were brought before the court for arraignment. Upon the arraignment of Joseph Thompson Hare, he pleaded not guilty. The indictment against Lewis Hare was then read to him, when Mr. *Mitchell*, on the part of the prisoner, observed, that the counsel were not prepared to plead, nor to advise what plea was proper to be entered. The court decided, that as the prisoner had been arraigned, he must plead *instanter*; and observed, that his plea should not be considered with any prejudice to his rights, and might be withdrawn the next day, if the counsel thought proper. A plea to the jurisdiction, and a plea of not guilty were then tendered. John Alexander was then arraigned, and the same plea tendered.

*Tuesday, May* 5th—The prisoners were brought before the court. Their counsel asked leave to withdraw their pleas, stating they had not considered what course would be most beneficial for the accused. Mr. *Kell*, on the part of government, objected, unless the counsel for the prisoners would state what was their object in withdrawing the pleas. The counsel replied, that they had entered them upon an unconditional promise of the court, that the pleas might be withdrawn if the counsel for the prisoner thought proper. To this Judge Houston assented; and by order of the court, the pleas were in each case withdrawn. The prisoners were then severally placed in the bar, and were informed by the court, that they had allowed their pleas to be withdrawn, and that they were now to plead anew. The indictments were then read in each case, and the prisoners were severally arraigned, and upon being asked whether they were guilty or not guilty, they stood mute and refused to answer. The counsel for the prisoners informed the court that they had instructed them to stand mute. The district attorney then stated, that the court might proceed in the same manner as if they had pleaded not guilty, either under the 30th section of the act of congress of 1790, entitled, "An act for the punishment of certain crimes against the United States," or that the court might proceed against them as at common law. The court, however, took time till the next day, to make up their opinion on the proper course of proceeding.

*Wednesday May* 6th.—The court met, and the counsel for the prosecution and the counsel for the prisoner appearing, the court heard an argument on the proper course of proceeding in the trials of the prisoners.

*Reverdy Johnson, Esq.* on the part of the prosecution, addressed the court to the following effect:—The court are now called on to decide a question, which I believe has never before presented itself to any of the courts of the United States. That is, whether this court has the power to proceed to the trial of the persons in-

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

dicted of robbing the mail of the United States, notwithstanding their refusing to plead, or, in technical language, their standing mute? As one of the counsel for the prosecution, it becomes my duty to show the court they have such power.

If this offence was especially contained in the act of congress of 1790, chap. 9., then there could be no doubt as to the course which the court on this occasion ought to adopt; because it would be expressly provided for by the 30th section of that law. It will, however, no doubt, be contended by the counsel for the accused, that inasmuch as the offence for which their clients are indicted, was not created by the act of congress of 1790, but by that of 1810, for the regulation of the post office; that, therefore, the provisions of the 30th section of the former law, for incidents like the present, in the trial of offences, only embraces offences created by that law, and does not extend to those of a subsequent origin, or in other words, that that provision cannot be construed to apply to offences which did not exist at the time such provision was made. I will, however, endeavour to convince the court, that by a fair and liberal construction of the act of congress of 1790, the case before the court is included in the provision in question; by the 29th section of that law, after directing that every person accused of treason, shall have a copy of his indictment, and a list of the jury, &c. three days before he shall be tried for the same; and it is further directed, "*that in other capital offences,* he shall have such copy of the indictment, &c. two days before his trial." That section farther provides, for persons so accused, many other rights and privileges. Then comes the 30th section, and so far as is necessary for the consideration of the question before the court; it is in these words, "If any person be indicted of treason against the United States, and shall stand mute, &c. or if any person be indicted of *any other of the offences herein before set forth,* for which the punishment is declared to be death, if he shall stand mute, &c. the court in any of the cases aforesaid, shall, notwithstanding, proceed to the trial of such person so standing mute, &c. as if he or they had pleaded not guilty, and render judgment thereon accordingly."

The court will perceive, that the offences in both these sections of the law are enumerated in the same order, and that the only variance in their language is, that the words "*other capital offences,*" are used in the second sentence of the 29th section, and the words "*offences herein before set forth,*" in that of the 30th section. From this similarity, therefore, it would seem to follow, that the provisions of both sections should receive the same construction; and since no one can doubt but that the persons now indicted are entitled to copies of the indictments, and to all the other privileges given by the 29th section, so also, it seems to me impossible that any one can conceive that the power of the court to proceed to trial, when the party stands mute, as provided by the 30th section, does not also extend to the case now before the court. Again; the words "*herein before set forth,*" contained in the 30th section, which the counsel on the other side will contend prevents the provisions of that section from applying to the case before the court, can, as I apprehend, receive no other sensible construction than that which will extend it, not only to offences specially described

in the preceding part of the law, but to every offence previously mentioned; and since the general words, "other capital offences," in the immediate preceding section of the law, it is admitted on all hands embraces every offence against the laws of the United States, and, therefore, the offence now to be tried; it follows, that the provisions of the 30th section extend also to this case. As another reason for giving liberal construction to the words "herein before set forth," I would remark to the court, that the provisions of the 30th section did not infringe any right, which persons in such situations previously enjoyed, but on the contrary, gave them an additional privilege. To show the court that I am correct in this opinion, I refer them to the 11th section of the act of congress of 1789, c. 20., by which exclusive jurisdiction of all crimes and offences, cognizable under the authority of the United States, is given to the circuit courts of the United States, except where it is otherwise directed; and to the 34th section of the same law, where it is provided, that the laws of the several states, except when otherwise directed, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply. If then the provisions of the 30th section of the act of congress of 1790, should be construed by reason of the words "herein before set forth," to extend only to the offences created by that act, it follows, that in the trial of all other offences, where the persons accused stood mute, the court would be obliged to proceed as the laws of the state, in which the trial happened, in like cases directed. What then previous to the act of assembly of Maryland, of 1809, c. 138. by which, in all cases of treason or felony, where the party stands mute, a similar provision is made to that of the 30th section of the act of congress of 1790, was the law in such cases in this state? I state it to have been, and I do so without fear of contradiction, that a standing mute amounted to a confession of the charge, and that judgment would have been rendered thereon, as on the finding of the verdict. In order to satisfy the court that such was the law, I refer them to Kilty's Report of English statutes, p. 17., wherein a note on the statute of Westminster, 3 Edward I. c. 12., two cases are cited in which such a judgment was awarded, and to the statute of 12th Geo. III. c. 20. which directed such judgment in all cases of felony, to be entered, which statute extended to this state by express provision, as the court will find by the same report of statutes, p. 199. I think that I have now satisfactorily shown the court, that I was right in saying, that the 30th section of the act of congress of 1790, did not restrain, but enlarged the privileges of persons accused of offences against the laws of the United States. If, however, the court should be of opinion that I am wrong in giving this liberal construction to the act of 1790, and that the provision of the 30th section of that law cannot be made to apply to the case before the court. I think there is another ground, on which the court may safely proceed to the trial of these persons, and it is shortly this. By the 34th section of the act of congress of 1789, c. 20. which I have before had occasion to refer to, it is directed, "that the laws of the several states, except where the constitution creates, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

common law in the courts of the United States, in cases where they apply." I imagine it will hardly be contended, that this provision was intended to be confined to such laws of the states as were in existence at the time that act of congress was passed. There is nothing in the language of the provision which justifies such a restricted construction. The words are general, that the laws of the several states, &c. shall be rules of decision in the courts of the United States, except where it is otherwise directed. What then is the law in this state, on a case like the present? By the act of assembly of 1809, c. 138. section 12. which I have also before incidentally noticed, it is provided " that if any person be indicted of *treason* or *felony*, and he or she shall stand mute, or will not answer to the indictment, the court in such case shall notwithstanding proceed to the trial of such person so standing mute, as if he or she had pleaded *not guilty*, and render judgment thereon accordingly." If therefore, the court should be of opinion, which I am far from anticipating, that they have no authority to go on with the trial of those persons, under the 30th section of the act of congress of 1790, I imagine they then cannot doubt, but that they have such power under the act of assembly of this state, when taken in connection with the 34th section of the act of congress of 1789. Because, if " there be nothing in the constitution, treaties, or statutes of the United States, which otherwise provides," that act of assembly must be regarded as a rule of decision by the courts of the United States, and this court is bound by it under the 84th section of the act of congress of 1789 ; and as no such provision can be found, this court has full and complete authority, nay, they are compelled to proceed according to that act of assembly, and that is, to go on to try those persons as if they had pleaded not guilty. Here I think I might safely rest this question. There are, however, some other remarks which, with the permission of the court, I will now suggest. If the acts of congress of 1789 and 1790 had never passed, I feel but little hesitation in saying, that you would notwithstanding have no difficulty in proceeding with this trial ; because, as the trial by jury for offences of this kind is directed in general words, by the constitution of the United States, it would follow, that all the incidents to that mode of trial, in the absence of particular provisions on the subject, would be considered as also directed. In the whole history, then, of jury trial, previous to the time of Edward *I.* I defy the counsel for the accused, to point out a single instance where a person escaped a trial by standing mute. If this mode of trial was ever at any stage of its existence, so defective as to suffer such an escape, it is obvious, that they would always have been effected, and that the trial itself would have been only a mockery of justice. The gentlemen may possibly say, that the party might have escaped a trial by standing mute, he could not have escaped with impunity, as he would have been subject to the dreadful punishment of " *piene forte et dure.*" I deny, however, that such a punishment ever existed at common law. We are to look for its origin to the statute of Westminster, 3 Edw. *I.* c. 12. By the common law, standing mute was, in all cases as it is now, by the statute of 12 George *III.* a confession of guilt. To prove this, I refer the court to 4 Black. Com.

327. In the United States, however, it is very certain that the punishment of "*piene forte et dure*," never existed.

In the absence then of all statutory provisions, the court would be justified in considering those persons as confessing their guilt, and in according judgment against them accordingly. There is, however, another reason, which to my mind, shows conclusively, that you must have the power to proceed with this trial, and it is, that if you have not that authority, those persons must escape unpunished, since the state courts, in cases like the present do not possess concurrent jurisdiction, because they have not the power of punishing to as great an extent as the act of congress prescribes for the punishment of those persons if they should be convicted. The courts of the states have only jurisdiction over the prosecution of such offences against the act of 1810, under which the persons now before the court are indicted, as by the laws of the state they can punish to as great an extent as that act directs. If then the counsel for the accused are right, robberies of the mail of the United States may be effected with almost perfect safety, since, if detected, the robbers may escape being tried, by adopting the plan of the persons now charged with that offence; or in other words, if they will only stand mute, when arraigned, they may securely bid defiance to the laws of the land, and render the act of 1810, so far as it regards the offences of robbing the mail, a dead letter. I believe I have now put the court in possession of all the observations that have occurred to me on this question. I feel confident that much more might be said than I have been able to suggest. I shall be followed however by gentlemen who will add every thing which the question admits of. I feel sorry that I should have suffered myself to have trespassed so long on the patience of the court. I return the court thanks for the kindness with which they have listened to me, and I conclude with a full assurance that this trial will go on as if the prisoners had pleaded not guilty.

*Elias Glenn, Esq.* District Attorney for the Prosecution.—The question now under consideration presents more of novelty than of difficulty. The learning respecting standing mute has been long considered rather as a subject for the curious student, than of essential importance to the practical lawyer. To-day, for the first time since the adoption of our present form of government, we have to inquire a little into its nature, and to ascertain, whether the voluntary act of a criminal can obstruct the progress of justice, and put at defiance laws the most salutary and necessary for society.

According to my understanding of the case, this is its situation—upon their arraignment in the first instance, the prisoners pleaded not guilty; their counsel, after some advisement, thought proper to request of the court that this plea might be withdrawn, in order, according, to my impression, that the prisoners might plead *de novo*, for if such an understanding had not existed with the court, would they for one moment have permitted any alteration to have been made in a plea which gave to the prisoners every fair and proper advantage that a prisoner ought to possess—if such impression were correct, and the court knew, as is the fact, that the visitation of

BALTI-
MORE,
May, 1818.

U. States
v.
Hare.

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

God has not silenced the prisoners, would it not be proper for the court to insist on some plea being filed in the cause ?

But waving, for argument's sake, this consideration—let us enquire in what predicament the court is now placed—whether the trial must stop at this place, and the infliction of the punishment provided by law for offences of the high character charged in this indictment is to be prevented by this course of proceeding.

I shall contend on this point—1st. That this conduct of the prisoners is a constructive confession, and the court must proceed to pass sentence upon them. Or 2d. That the court may proceed to the trial, as if the general issue plea of not guilty had been interposed.

1st. The counsel for the prisoners contend that this is a *casus omissus* in the law, and there being no common law by which the courts of the United States can be governed in criminal cases.— We must stop here. If the prosecution is to derive no benefit from the common law, the prisoners must be upon the same footing in this respect; they are to have no benefit of it either, and our common sense is called in to govern in the decision of this case—and what would that say ? that the prisoners were guilty; that their silence is a constructive confession. In pleading (which is justly said to be a system of sound reasoning) not denying an allegation, is an admission of it. If a defendant in a civil suit say nothing, judgment is rendered against him.

If a charge be made against a man in his presence, and in his hearing, and he does not deny it, this might be given as evidence to prove the fact thus charged upon him. Now, if the very facts laid in this indictment had been charged upon the prisoners in any other place than a court of justice, and they had pursued the same line of conduct which they have now adopted, such conduct would have served as testimony to have produced a conviction for this very crime.

For whose benefit was the provision of the act of April 30th, 1790—for the benefit of the prosecution or of the prisoner ? Unquestionably for the benefit of the prisoner: he is by his obstinacy, amenable in a degree to the court; but our laws (wishing to give a criminal every possible advantage of a *fair and impartial trial*) have considered him as guilty of no offence in the particular cases therein mentioned ; then if the provisions of that act do not reach this case, the prisoners are not even entitled to the lenient and merciful provisions of that law.

On the second point Mr. Glenn contended, that as an incident to the power and authority of the court, they had a right to try these men. The prisoners have divers privileges for their own benefit; they may plead not guilty, they may have counsel, they may have witnesses, they may challenge jurors, they are entitled to a copy of indictments, and a list of the witnesses. But if they decline the enjoyment of their rights, is the progress of justice to be arrested ? If they will not receive a copy of their indictments, are they never to be tried ? If they will not enjoy the benefit of counsel, is the court obliged to wait until their better judgment shall induce them so to do ? If they will not challenge jurors, must the court pause until they think fit to challenge them ? These are all

privileges granted to the prisoners; they may accept or refuse them at their pleasure; but such refusal shall never operate to retard the march of justice in its course.

In England, a speedy disposition of these causes would have been made by the common law; this conduct of the prisoners is a constructive confession. Staundford's Pleas of the Crown, 149, 2 Hawkins' Pleas of the Crown, ch. 30 § 13. 2 Hale's History of the Common Law, 317. 322. 4 Bl. Com. 324. 329. Now if the court cannot proceed with these trials, the monstrous absurdity follows, that a criminal by a shift, a trick, may forever evade the provisions of a penal law—a proposition, the statement of which carries with it its own refutation.

This court must frequently proceed according to the directions of the common law; they can fine jurymen and witnesses for non-attendance, nay if a bystander had advised the prisoners at the bar to stand mute, would the court not have punished him for such conduct? In England they certainly would. 4 Bl. Com. 126. It would be arresting the progress of justice, and I think the court would be fully authorized to impose a penalty similar to that inflicted in England.

But we consider this case as coming reasonably within the provisions of the act of 30th April, 1798, or to be governed by the rules of the Laws of the State of Maryland. See act of congress, September 24th, 1789, vol. 4. p. 47. and Laws of Maryland, 1809, ch. 138. We are willing to allow to the prisoners every advantage which they could derive under a plea of not guilty, and not even by their own improper conduct to injure their cause.

*Charles Mitchell, Esq.*—The court will find on examination, that this is not one of the cases of standing mute mentioned in the act of congress, where they are to proceed as if the prisoners had pleaded *not guilty*. Those cases are specifically enumerated in the act of 1790, and this power is limited to the cases there specified; *robbery of the mail*, is not one of them. You must proceed then according to the law and practice of this state, at the date of the judiciary system. At that period the common law practice prevailed here; but the statute of Westminster, 1st. and the subsequent English statutes to 12 George 3d. providing for such cases, were never extended to this state. It was by statute alone that the English courts were enabled to punish him who stood mute as if he had pleaded guilty. At common law there was no such power. The utmost extent of common law punishment was *severe imprisonment until he pleaded*. Even the *pine et forte* was a *statute* punishment. If the prisoners stand *obstinately mute*, therefore, it is a *casus omissus*. You have no power to try them, or to inflict capital punishment. But if an inquest is awarded to inquire *how* they stand mute, it will be ascertained that they do *not* stand *obstinately* mute, but have merely exerted a legal right to refuse to plead *because their arraignment was irregular* and against the law of the land. I do not intend, however, to enter into the discussion here. It was no part of my object in rising to address the court. I have merely said thus much to satisfy the court, that whether our conclusions are well or ill-founded, we have some plausible reasons at least for the course we have adopted, and have not been impelled by a wan-

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

ton desire to embarrass the court without any prospect of advan-- tage to our clients. We had indeed indulged the hope that the court knew us too well to render such an assurance or explanation necessary; but the unusual, unexpected, and extraordinary appeal from the district attorney has extorted these remarks where we should otherwise have been silent. The gentleman has charged us with *obstructing the course of justice*, and vehemently asks if such conduct *is to be tolerated here*, which in the courts of Great Britain would subject us to fine and imprisonment. Sir, I deny the law to be so in England as he stated it, and whenever he feels disposed to enter into that question, shall be ready to meet him; but if it *were* so *there*, I desire to bless God and those who purchased our inestimable privileges with their blood, that our situation in *this court* is not so humble and degraded. Has the gentleman forgotten, sir, that while in England the accused is denied the aid of counsel altogether, except on *questions of law*, and then receives it as pure *bounty* from the court—here, he has a legal—nay, a constitutional right to be heard and advised by counsel in every stage of the proceedings against him; that while in the criminal courts of England the counsel for the prisoner is the mere creature, the automaton, the very *serf* of the court, holding his place by a base and servile tenure—*here*, he is an independent officer of the constitution, standing erect and firm on his constitutional freehold, and accountable to God and his conscience alone for whatever advice he may give his client. Execrated let him be, and forever abhorred by his professional brethren, who shall meanly shrink from the sacred duties he has to perform, or tamely suffer the interposition of any judge or court between him and his client. Sir, we have deemed it a legal right of the prisoners to refuse to plead; we have thought it might be beneficial to them; and with these impressions, if we had not advised, or having advised, were afraid to avow it, should we not merit the blasting mildew of public reproach which would inevitably fall upon us after the warring passions of the multitude against these prisoners shall have abated. We *have* advised our clients to insist on every legal advantage in defence of their lives, and here openly avow it, fearless of consequences. Our object is to save them from punishment, if not *legally* obnoxious to it, whatever may be their *moral* guilt; and this cannot be censured in counsel but by those whose unhallowed thirst for blood must be slaked in spite of the constitution and the laws of their country.

*David Hoffman, Esq.*—I shall solicit your Honours' indulgence, while I briefly state our views as to the operation of the course adopted by the prisoners—viz. their standing mute.

The indictment in these cases is predicated on the 19th section of the act of congress, 1810. This provides, that if any person shall rob any carrier of, or other person entrusted with, the mail of the United States, of such mail, or a part thereof, such offender shall be imprisoned, not exceeding *ten* years; and if in effecting such robbery he shall *wound* the person having custody of the mail, or put his life in jeopardy, by the use of dangerous weapons, such offender shall suffer death.

The robbery of the mail, whether by mere putting in fear, wounding, or placing life in jeopardy, is an offence against the United

States, *originating in this act of congress.* Its legal criminality, as a specific crime or public wrong against the union, is derived solely from this source. In *this act* we find no provision whatever on the subject of standing mute, nor do we find that any other act of congress has legislated on the subject, except the act relative to crimes and punishments of 1790, section 30, which surely can in no way apply or be extended to the present case, since that act provides for the case of standing mute *only* on indictments for crimes *enumerated in that act.* The present must therefore be a clear *casus omissus*; for the act of 1790 enumerates a variety of public wrongs, such as treason, piracy, perjury, bribery, forgery, falsifying of records, &c. &c., and constitutes these *crimes* against the United States. It then provides, that if " any person or persons be indicted *of any of the offences herein set forth,* for which the punishment is declared to be death, if he or they shall *stand mute or will not answer the indictment,* or challenge peremptorily above the number of twenty persons of the jury ; the court in any of the cases aforesaid shall, notwithstanding, proceed to the trial, as if he or they had pleaded not guilty, and render judgment thereon accordingly." Mail robbery, it is to be observed, is not one of the crimes enumerated in this act, but is an offence created by statute twenty years after. The power of the court to proceed to trial on the prisoner's standing mute is given by no other statute than the act of 1790, and this, as we have seen, only where the prisoner is indicted for a crime enumerated in that act. As this is not there to be found, but originates in a law long subsequent, the legal *sequitur* to us appears to be that the present is a case at common law, wholly unaffected by the act of 1790.

The provision relative to standing mute, contained in the 30th section of the law of 1790, surely will not be extended to the offence made a crime by the act of 1810 ; inasmuch as it is a principle of law, that a statute which takes away a common law remedy, or *privilege* ought never to have an equitable construction. 10 Mod. 282. And it is laid down that if the words of a statute do not extend to a mischief which rarely happens, they shall *not* be extended by an equitable construction, to that mischief, but the case shall be considered as a *casus omissus.* Vaugh. 373. As, therefore, the act of 1810, on which the indictment is founded, contains no provision for the case of standing mute, and as the common law operation of standing mute appears to have been recognized by congress, and as the act of 1790 is the only statute speaking on the subject, and this extends expressly to the offences *therein specified,* and as its provision ought not to be extended by equitable construction, it appears to me a sound and legitimate conclusion that the present, as I have just stated, is a case of standing mute at common law, and as such is to be dealt with differently from the case of an indictment for treason, piracy, &c.

What then is to be the proceeding of this court, if the view I have just taken, and I hope with great deference, be correct? The books on this subject say that if a prisoner on his arraignment *stand mute,* the court *ex officio* must ascertain, by a jury, whether this proceed *ex visitatione Dei,* or *ex malitia.* On the verdict of this jury a judgment of mute is to be entered ; and if it be decided that

BALTI-
MORE, ·
May, 1818.

United States
v.
Hare.

the muteness be from the visitation of God, the court shall proceed to the trial as if he had pleaded not guilty. This power, it will be perceived, is only in case the muteness be *ex visitatione Dei*, vide 2 Hale's P. C. 317. 15 Vin. Abr. 532. And on this judgment, the better opinion appears to be that no sentence of *death* can be given. 2. Hale's P. C. 317. 4 Black. Com. 324.

If the decision be that the prisoner is mute *ex malitia*, that is, obstinately, and he stands indicted for a felony, he can neither be *tried* nor *convicted*. He cannot be tried, because there is no *issue*, for there can be no issue without a *plea*, and, as we shall presently see, the judgment of *piene forte et dure* was introduced to extort a plea. Nor can such a prisoner be *convicted*, because standing mute amounts to conviction only in felonies of the highest and lowest degree, viz. in treason and petit larceny: so that *quacunque via data*, we cannot perceive how the prisoners in the present case can receive sentence of death; since the muteness, if supernatural, cannot be followed up by a judgment of death, and if from obstinacy, it is equally so, as there can be neither verdict nor conviction. 4 Black. Com. 325.

It may be proper here to note an error of the learned district attorney, who in his observations just addressed to the court, states it to be undoubted law, that standing mute in all cases, from the highest to the lowest crimes, amounts to conviction, and that the courts of England, for centuries past, have considered it so. The law I apprehend is not so. Standing mute amounts to conviction only in the highest *and* lowest crimes, viz. treason and petit larceny; and *not* as the gentleman has asserted, from the highest *to* the lowest. Prior to the statute 12 George III. a. 20. (which can have no operation in this court, and therefore is to be wholly disregarded) standing mute on indictments for any felony, other than treason and petit larceny, was uniformly followed, not by conviction, but by the judgment of penance. The books are so explicit on this point as to render misapprehension scarcely possible. Disingenuousness in stating the law is at all times censurable; but in a state officer, prosecuting in a case affecting the most dear and most valuable possession we have—*life*, it is surely doubly reprehensible.

The crime, then, for which these prisoners stand indicted, being neither treason nor petit larceny, nor a crime affected by the 30th section of the act of 1790, which authorizes the court to proceed to trial in certain cases of standing mute, the present must be a case in which, in England, prior to the statute 12 George III. the court would have proceeded to the sentence of penance, or *piene forte et dure*. Admitting, then, that had this case occurred in the court of king's bench, prior to the statute 12 George III. the court would have awarded penance as the only means within their control, and conceding, *gratia argumenti*, this court to possess the power of awarding this terrible judgment, is the court *now* in a situation to pronounce such a judgment? Has there been that preliminary procedure, which forms the legal foundation for such a judgment? Has there been a jury impannelled to pronounce whether this 'muteness were obstinate, or by visitation of God? Has there been a judgment of mute? Farther, the books say, that a mute prisoner is entitled to a respite for reflection. The sentence of penance

is to be solemnly read to him, that he may be fully apprized of his danger. He is then to receive the' *trina admonitio.* 15 Viner's Abr. 532. Staunf. P. C. 149. None of these formalities have taken place, so that if the court possess the power to award penance, as would unquestionably have been the only power of the court of king's bench, anterior to the 12 George III., the exertions of this power should have preceded the forms just stated.

Let us now briefly examine, whether this court can be considered as possessed of the power awarding any such sentence. Such a power can be derived only from

1. The common law of England.
2. The statutes of England.
3. The acts of congress.
4. The acts of Assembly of the state of Maryland.

1. Admitting for argument, this court in some cases to be guided by the English common law, the common law could give this court no such power, as the power itself in England is not derived from the common law, but from the statute of Westminster, 1. 3 Edw. 1. vide Barring. on Statute, 82. 4 Bl. Com. 327. Pref. to 1 vol. state trials, XII.

2. There are no statutes of England, either prior to or since the declaration of independence, of any force or operation whatever, in any of the courts of the United States, so that we need not seek for this power in this source.

3. It will not be pretended that any act of congress has legislated on the subject.

4. Nor has any act of assembly of this state any provision whatever, relative to this judgment of penance, and the statutes of Westminster, 1. 3 Edw. has not been considered as extending to this state. Vide Kilty's Report of British statutes.

The case under consideration appears, therefore, to be one in which the prisoner can be made responsible, if at all, only under the 3d count of this indictment, which is for an offence *not capital.* If these men be guilty of a crime which forfeits their lives, it may be a matter of regret that they cannot be amenable to the punishment so manifestly intended. But if the law be defective, let it be amended by the national legislature.

The *piene forte et dure* was introduced in feudal times for the purpose of extorting a plea in capital cases, so that if death ensued, there might be a *forfeiture* or *escheat* of the prisoner's lands. But if there were no plea, corruption of blood, forfeiture, nor escheat could ensue.

Finally, the prisoners in the present case stand mute. Can this court proceed to judgment as on a confession or conviction? We apprehend not, as standing mute is equivalent to conviction only in treason and petit larceny, and the statute 12 George III. which renders standing mute in all cases a constructive confession, cannot alter the law of the case in this court. Can the court enter the plea of not guilty for the prisoners? We presume not, for even criminals have their rights; they cannot be forced to plead. Can this court proceed to trial as if the prisoners had pleaded not guilty? We humbly conceive not, as such a power is no where given but

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

in the act of 1790, and there only in the cases of crimes therein specified.

If the views I have thus briefly, hastily, and even to myself, un-expectedly taken, be not wholly unsound, I earnestly and respect-fully entreat the court to accord to it some consideration, and in favour of life, not to proceed but with great caution and considera-tion.

*Thomas Kell, Esq.*—On the part of the prosecution, addressed the court as follows:—It is sufficient for me to consider this case as I find it to be.—Having heretofore taken no other part therein than suggesting the propriety of the prisoners' counsel intimating to the court how the prisoners intended to plead when they asked leave to withdraw their first pleas, I saw, or thought I saw that some delay, if not difficulty, might arise from the course then proposed. That permission, however, having been given unrestricted, they may exercise whatever right they possess in such way as they deem best; either by pleading to the indictment, or refusing to plead and standing mute; the latter they have preferred, and we are now to inquire what is to be done. Can it be conceived that the court is here to stop; that your authority is suspended; your jurisdiction and cognizance of this offence restrained by the silence of the accused. If so, every offender would find it his interest to be silent too, if thereby he could avoid your power and authority to reach him or his offence. Is it possible seriously to think so great an anomaly can exist in the law?

What is to be done? You cannot make the man speak; the common law does not reach him in this court, and his right to be silent is not derived from that law; in standing mute, he exercises a right derived from nature and his Maker. But is he not to be tried? is he to go unpunished if guilty? I answer, no; there is no difficulty in the course to be adopted by the court.

If this case is embraced by the act of congress regulating the trial of criminal offences, and I contend it is, then the way is clear, and the provisions of that act point out the course. Mr. Kell then read the 29th and 30th sections of the act of congress relating to crimes.

"Sec. 29. *And be it enacted,* That any person who shall be ac-cused and indicted of treason, shall have a copy of the indictment and a list of the jury and witnesses, to be produced on the trial for proving the said indictment, mentioning the names and places of abode of such witnesses and jurors delivered unto him at least three entire days before he shall be tried for the same, and in other capi-tal offences shall have such copy of the indictment and list of the jury two entire days at least before the trial. And that every per-son so accused and indicted for any of the crimes aforesaid, shall also be allowed and admitted to make his full defence by counsel learned in the law; and the court before whom such person shall be tried, or some judge thereof, shall, and they are hereby author-ized and required, immediately upon his request to assign to such person such counsel, not exceeding two, as such person shall de-sire, to whom such counsel shall have free access at all seasonable hours; and every such person or persons accused or indicted of the crimes aforesaid, shall be allowed and admitted in his said defence

to make any proof that he or they can produce, by lawful witness or witnesses, and shall have the like process of the court where he or they shall be tried, to compel his or their witnesses to appear at his or their trial, as is usually granted to compel witnesses to appear on the prosecution against them.

"Sec. 39. *And be it further enacted,* That if any person or persons be indicted of treason against the United States, and shall stand mute or refuse to plead, or shall challenge peremptorily above the number of thirty five of the jury; or if any person or persons be indicted of any other of the offences herein before set forth, for which the punishment is declared to be death, if he or they shall also stand mute or will not answer to the indictment, or shall challenge peremptorily above the number of twenty persons of the jury; the court in any of the cases aforesaid, shall notwithstanding proceed to the trial of the person or persons so standing mute or challenging, as if he or they had pleaded not guilty, and render judgment thereon accordingly."

He then proceeded.—It cannot be doubted that the language of the 29th section embraces this case; after directing the providing in a case of treason, it directs, "and in other capital offences," certain proceedings preparatory to the trial shall be had; this is a capital offence, and the directions given in the section apply to it; it is farther provided that "every person so accused and indicted, for any of the crimes aforesaid," shall have the benefit of counsel; and farther, that "every person accused or indicted for any of the crimes aforesaid," shall be allowed the benefit of their witnesses, and process to compel their attendance. Is it not the just construction, that the terms "*any of the crimes aforesaid,*" in which the benefit of counsel is allowed; and also that the words "*the crimes aforesaid,*" in which the benefit of witnesses is allowed, relate and refer as well to the "*other capital offences,* embraced in the second provision of the section, as to the offences previously named in the act? Is it not also true, that by the terms "*other capital offences*" used in this section, is meant and included *all* capital offences, not those only which are previously mentioned in the act, but such also as might be subsequently declared. The unlimited sense and meaning of the terms embrace all; and there is nothing to restrict them to those offences only, which are previously designated in the act. Again; if these different provisions of the section are made to relate only to the offences specified in this act of congress, what becomes of the prisoner's benefit and right of challenge, or the privilege of his counsel? If the construction I ask for be wrong, they would soon have to become as *mute* as their clients; the construction I contend for secures those privileges; they are not given by the post office law, which creates the prisoner's offence.

The 30th section, after providing for a refusal to plead or too great a challenge in case of treason, provides that "if any person be indicted of any other of the offences herein before set forth, for which the punishment is declared to be death, if such person stand mute or challenge above twenty jurors, the court shall proceed as if the accused had pleaded not guilty." Upon this provision I insist that the language, "any other of the offences herein before

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

set forth for which the punishment is declared to be death," ought not to be restricted to those offences only which are created by this statute; that the language and meaning relate as well to those offences set forth in the 29th section, by the description "other capital offences," that this description contains, and is a setting forth all capital offences, and all such are thus brought within the provisions of this section, if the punishment be death,· which is the case in this present instance. The act of congress presents one continuing system regulating criminal trials, and offences created since its passage are equally affected by it as if they had existed before. It is the law operating to day as if but just enacted.

The construction thus contended for is the more lenient and favourable to the accused; and if hereafter we. should have any discussion about the right of challenge, the gentlemen, his counsel, will have to claim my construction to show that right; it cannot be found unless this case, be within the provisions of these sections; this right and several others are not given by any other law.

If I am right in the view I have submitted of this subject, the course to be pursued is quite plain; it is to proceed in the trial as if the prisoner had pleaded not guilty, that being directed by the statute.

But if I am wrong in this view, and if the provisions of this act should be held not to govern this case, (which I do not apprehend,) and the authority of the common law be absent here, I ask again, is the offence, if committed, to pass unpunished? Is there no power to try him? I reply there is. This court possesses (by the law creating its powers) jurisdiction over this man and his offence. You have cognizance of, and authority to try the offence, (see the 11th section of the judiciary act,) and the only question can be, how is this authority to be applied? the man chooses to be silent, he will not plead, and there is no power to make him; yet there is power to try him. It is in vain to say he cannot be tried because he stands mute. The court rightfully may, and no doubt will go on to try him in such way as will not infringe any right secured to him by the constitution and laws of the government. Looking to these for their direction, (if the case be not regulated by the 29th and 30th sections before read,) the court will settle the forms of proceeding; the trial by jury with all its benefits will be preserved to him as secured by the constitution. See 8th article of the first amendment

If the court proceed with any analogy to the state practice, it would be by entering the plea of not guilty for the prisoner, that being the course directed by the statute of Maryland in similar cases. If with reference to other cases under the act of congress, the trial would progress as if he had pleaded not guilty; there being no issue joined in the case, the substance, if not the form of the jurors' oath would be to try whether the prisoner be guilty of the matters whereof he stands indicted, or not guilty; in framing the oath there can be no difficulty.

But we are told that this is a *casus omissus* in the law; it may be so in the letter of the statute, but surely it is not such in the meaning or reason of it. There is no *casus omissus* in your cognizance of the offence, or right to try the offender; and if there

was no particular form of trial prescribed by law, the court could, and ought to supply it, otherwise your jurisdiction over the offence would be vain. I might enumerate many instances of this sort of difficulty; suppose some of the jury were to die after being summoned, or whilst attending the court, here would be another "*casus omissus*," in the letter of the statute; but do the gentlemen or any one else doubt the power of the court to have others summoned.

It would be strange indeed if it were thus in the power of a prisoner to arrest his trial, and paralyze your cognizance and jurisdiction of his offence.

Hence, sirs, I submit whether there be any thing to prevent the trial from going on, and conclude that it must progress as if the prisoner had plead in chief to the charge against him.

*Per Curiam.*—The two first named when arraigned, severally pleaded not guilty, the third pleaded not guilty, and also put in a plea to the jurisdiction of the court.

The attorney for the United States objected to the double plea put in by Alexander; but it being after the hour of adjournment, the court adjourned till the next day, when the prisoners again being severally arraigned, Mr. Mitchell, one of their counsel, asked leave to withdraw their pleas, intimating that he did not then know what to advise his clients to plead. In order to give the accused full opportunity to make their defence, the court granted leave accordingly, under the impression that their counsel meant to plead other pleas. The accused being severally called on to answer; were advised by their counsel to stand mute, and thus did stand mute; thus refusing to plead.

The attorney for the United States, moved the court to proceed to the trial in the same manner, as if the accused had pleaded not guilty, according to the 29th section of the act for the punishment of certain crimes against the United States. To this the counsel for the prisoners objected, contending that this mode of proceeding was applicable only to the trial of the crimes specified in the act for the punishment of certain crimes against the United States, and could not be extended by construction to the crime of robbing the mail, made capital by an act of congress subsequently passed.

On the part of the prosecution it was argued, that by the act to establish the judicial courts of the United States, full power and authority are given to the circuit courts of the United States to try all crimes and offences cognizable under the authority of the United States, and that the manner of conducting the trial prescribed by the 29th section of the act, for the punishment of certain crimes is applicable to all cases arising under laws subsequently passed, inflicting the punishment of death for the commission of any crime or offence. That standing mute by a criminal accused of a capital offence amounts to a constructive confession of guilt. That the privileges of a person accused of a capital offence, by the 20th section of the same act are general, and entend to the trial of all crimes made capital, whether specified in that act or not, and that the mode of trial must be the same. That by the 34th section of the act to establish the judicial courts of the United States, which provides that the laws of the several states, except when the constitu-

tion, treaties or statutes of the United States shall otherwise provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases when they apply; the laws of the state of Maryland, and the practice of the courts under them would justify the court in pronouncing the prisoner guilty on his standing mute.

The question presented to the court is a novel one in the courts of the United States, but it is a question in the decision of which they cannot doubt the power and authority of the court to proceed to the trial of the accused.

By the constitution of the United States it is declared, that the trial of all crimes except in cases of impeachment shall be *by jury*. The act aforementioned to establish the judicial courts of the United States gives to the circuit court *exclusive* cognizance of all crimes and offences cognizable under the authority of the United States, except when a different provision could be made. The act regulating the post office establishment by the 35th section, grants authority to the judicial courts of the several states, under certain restrictions, to try all causes of action arising under and all offences against that act; but this grant of power is *permissive*, and does not impair the authority of the courts of the United States to try certain causes under that act. Without this grant of power to the courts of the states, the jurisdiction of the courts of the United States would have been *exclusive;* with it, their jurisdiction is *concurrent.*

By the constitution a fair and impartial trial by jury in all criminal prosecutions is secured to every citizen of the United States. After all these solemn and salutary regulations, it would be strange indeed if the accused could by any management evade a trial by jury.

The courts of the United States have not common law jurisdiction in criminal cases. They will not punish an offence at common law unless made punishable by statute. But they will resort to the common law for a construction of common law phrases. . *Standing mute*, according to the ancient common law of England from whence we have derived most of our institutions, was, in many cases, tantamount to a confession of guilt. And now, by statutes passed at different times, standing mute in all cases amounts to a constructive confession, and is equivalent to conviction. Robbery is felony by the common law. It is made felony by the laws of the United States, and punishable with death whether committed on land or water. Robbery of the mail, if committed with the use of weapons which jeopard the life of the carrier, is felony, and punishable with death. How is the criminal to be tried? Let the constitution and laws of the United States furnish the answer—*by jury*. This mode of trial is secured by the constitution to the accused in all criminal prosecutions; and the laws of the United States give full power and authority to the courts of the United States to try all offenders, and the trial is imperatively directed to be by jury. Yet the counsel for the prisoners contend that by *standing mute*, the criminal can evade a trial altogether. As well might they contend, that if the plea to the jurisdiction had not been withdrawn, and the court had passed their judgment of *respondeat ouster*, and

the accused had refused to answer, there would have been an end of the trial; *standing mute* and *refusing to answer* being substantially the same. The *piene or (prisone) forte et dure*, to compel an answer is unknown to the laws of the United States. The act for the punishment of certain crimes directs that if any person indicted of any of the offences, other than treason, set forth in the act for which the punishment is declared to be death, shall stand mute, or will not answer to the indictment, or challenge peremptorily above the number of twenty persons of the jury, the court shall, notwithstanding, proceed to the trial as if he had plead not guilty, and render judgment accordingly. The act for regulating the post office establishment inflicts the punishment of death on persons who may rob the mail, if attended with the aggravated circumstance before mentioned. The 19th section declares, that on conviction, the person committing such robbery shall suffer death. But how is he to be convicted? On trial by jury, conducted in the manner provided by law. The act for the punishment of certain crimes directs the manner, and if the person arraigned shall stand mute or will not answer to the indictment, or challenge peremptorily above the number of twenty persons of the jury, the court shall, notwithstanding, proceed to the trial *as if he had pleaded not guilty.* It is admitted, that penal statutes should be construed strictly; that is, they shall be construed according to the strict letter in favour of the person accused, if there be any ambiguity in the language of the statute. But who ever heard of a construction that would *prevent a trial altogether*, until the present time? Such a construction is calculated not only to defeat the purposes of justice, but to prostrate the constitution and laws of the union.

Several acts of congress supplementary to the act to punish certain crimes, have been passed at different times, inflicting heavy penalties for breaches of the law; and an act passed on the 3d March, 1817, prescribes the punishment of death for all offences committed within the Indian boundaries, which before that time were punishable with death, if committed in any other part of the United States. In order to a just construction, it is proper to consider the whole system of criminal jurisprudence as established by the United States in our view. All the laws should be taken in *pari materia*. The objection will then be removed, and the court may proceed on the trial.

If the laws of Maryland are to be regarded as the rule of decision, the result will be the same. The declaration of rights adopts the common law of England, and the trial by jury according to the course of that law; and also all the English statutes existing at the time of their first emigration, and which by experience had been found applicable to their local and other circumstances, and such others as had been since made in England or Great Britain, and had been introduced, used and practised by the courts of law or equity. As early as the year 1668 there are two cases on record in which criminals standing mute were sentenced by the court to be hanged. In the first case the crime was murder; in the second petit treason. By the act of 1737, c. 2. and 1744 c. 20, breaking open a tobacco house or other outhouse, and stealing goods and chattels to the va-

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

lue of five shillings sterling, and horse stealing are made felony and punishable with death; and if the accused shall stand mute, &c. the court may pronounce sentence against him. By the act of 1777 c. 20. if a person indicted for high treason shall stand mute, &c. the court may pronounce sentence of death against him, and all his estate is forfeited. The chancellor of the state in his report in pursuance of the directions of the legislature of English statutes, adopted and made applicable to Maryland, includes the statute of 12 Geo. 3. c. 20, by which standing mute in all cases of felony and piracy is equivalent to conviction.

*No new offence is created by the act of* congress regulating the post office establishment. Robbing is the *generic* term, and robbing is felony at the common law, and punishable as such. The state of Maryland, by an act passed in the year 1809, has adopted in substance, and almost in words, the provisions of the 29th section of the act of congress to punish certain crimes. It is provided by that act that in all cases of treason or felony, if the person accused shall stand mute, or will not answer to the indictment, the court shall proceed to the trial, as if he had pleaded not guilty, and given judgment accordingly. Hence it appears, that if the laws of the United States have not provided for the case, and the laws of Maryland are to be regarded as the rule of decisions, standing mute prior to the year 1809, would be equivalent to conviction. Subsequent to that period the trial would proceed as if the accused had pleaded not guilty.

The court orders that the trial proceed by jury, as if the prisoner had pleaded not guilty.

The court then appointed Saturday for the trial of the prisoners. ·

*Saturday, May* 9.—After the prisoner was placed in the bar for trial, General Winder made the following observations :

In the case now called it was with the greatest reluctance that he was compelled to ask the court for a delay of the trial until Monday; he was bound to ask this in justice to the person charged, and on account of the novelty of the case involving much law not heretofore discussed. He was decidedly of opinion that the prisoner ought to plead, but he was doubtful what plea it became him, as counsel, to advise him to put in. The delay asked for involved little or no inconvenience to the public. On Monday the counsel for the prisoner will come prepared. The indulgence he asked for he deemed not unreasonable ; by this short postponement an-opportunity would be given for counsel to speak as advisedly as counsel ought in a case which involves the life of their client. On Monday the counsel for the prisoner will be prepared to proceed in the trial.

Mr. *Wirt*, in reply to General Winder, observed that although the postponement of the trial till Monday would be inconvenient to him, yet he considered his own inconvenience of no importance in the decision of this motion ; but the court would recollect that there were other public officers of the government, attending as witnesses, to whom the delay might be still more inconvenient; that there were besides private witnesses attending at a great distance, and probably with great inconvenience to their private

affairs; that the counsel previously engaged by the prisoner, (three
or four in number,) had already had the most ample time for prep-
aration; that it was the prisoner's own fault that General Winder
had not been called in at an earlier day; that this very recent en-
gagement of that gentleman might be well suspected to form part
of a system of dilatory defence, calculated to defeat the trial at this
term; and he submitted it to the court. whether the conduct of the
prisoners. in the previous stages of this cause, had been such as
entitled them to the indulgence which was now asked.

General Winder, in reply, said he felt for the inconvenience of
the public officers and others attending on the trial, but the delay
asked for was a very short one. This day was an inconvenient
one to commence a trial which might not be finished until to-mor-
row, which would be Sunday; he considered that nothing which
had occurred in the proceedings in this case ought to operate, and he
trusted would not operate against the prisoner having a fair and im-
partial trial. The situation of the prisoner claims some indul-
gence. His life is at stake, and it is natural and excusable that
he should endeavor to avert his fate, and no attempt to do this
ought to deprive him of full opportunity of a fair trial. Surely this
ought not, and cannot make an impression unfavourable to him.
For himself, General Winder said, at this moment he was totally
unprepared to advise the prisoner, and he trusted the postponement
asked for, only until Monday, would be granted.

Mr. Wirt wished the court to understand distinctly that he was
perfectly willing to assent to the indulgence asked by General
Winder, so far as his own personal inconvenience was involved in
the proposition. That the assurance now so explicitly given by
General Winder, that the trial should proceed on Monday, was en-
tirely satisfactory to him, as one of the prosecution; and that for
the sake of affording the most ample opportunity of defence in a
case of life and death, he begged to be understood as giving his as-
sent, so far as that could avail to General Winder's motion.

*The Court.* We are of opinion that ample time has been allow-
ed. If the prisoner sustains any inconvenience he has brought it
on himself:—the trial must go on.

The clerk then commenced to call the jury.

General Winder asked the court, if they did not understand him
that on Monday the counsel for the prisoner would advise him to
plead. If they did not so understand him, he wished it now to be
so understood.

Mr. Glenn, the district attorney, observed, that he was disposed
under this pledge that the cause be postponed.

The court. It is of no importance whether a plea will be put in
or not, as the court have decided that they will proceed as though a
plea of not guilty had been entered.

Mr. Mitchell thought it proper to bring distinctly to the notice
of the court at this stage of the proceedings, *one fact*, to which he
apprehended sufficient importance had not been attached, althouhg
it could not entirely have escaped the eye of the court. Their hon-
ours *must* have been aware that *no copy* of the indictment *cou'd
have been* delivered to the prisoners or their counsel, pursuant to the

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

<table>
<tr><td>

BALTI-<br>
MORE,<br>
May, 1818.<br>
United States<br>
v.<br>
Hare.

</td><td>

act of congress, *two days previous to the arraignment.* In truth, no copy had been delivered at all, and the prisoner's counsel had no knowledge of the nature of the charge *at the time of the arraignment,* (within two hours of the indictment found,) except what might be derived from hearing the indictment once read by the clerk, and it was utterly impossible for them advisedly to plead *instanter,* according to the requisition of the court, in a case so vitally interesting to their client. They were far from being disposed to impede the *regular* course of justice, but were not authorized to dispense with that course, and they had refused to plead, not merely because they were unprepared, but also because pleading in chief was deemed a waver of their legal right to a copy altogether. This had been often decided as he was prepared to show the court, and even if it were not a legal waver, it was a virtual renunciation of the privilege secured by the act of congress; for of what possible use could a copy of the indictment be to the accused after pleading in chief? he could neither avail himself of a demurrer, a plea to the jurisdiction, nor of *autrefois acquit.* The act of congress is imperative. The accused *shall* have a copy of the indictment two days at least previous to the trial. The arraignment is a part of the trial. The act is a literal transcript from the English statutes, 7 Will. III, and 7 Anne, differing only in the number of days. In both these statutes, the word *trial* alone is used, and the English courts have uniformly considered the arraignment as a branch of the trial in their construction of these statutes. If the court have the least doubt on this point, they shall be abundantly satisfied by authority; for there is no contradiction in the books on this subject.*

</td></tr>
</table>

*\*Mr. Mitchell,* has furnished the Reporter with his notes and references on this subject, which are annexed.—viz.

" Any person who shall be accused and indicted for treason, shall have a copy of the indictment and a list of the jury and witnesses, &c., delivered unto him, at least three entire days before he shall be tried for the same; *and in other capital offences,* shall have such copy of the indictment and list of the jury, two entire days at least *before the trial.*—Act of Congress, April 30, 1790. vol. i. p. 100, sec. 29.

By the English statute, 7 Will. III. chap. 3. sec. 1. it is enacted, " that every person that shall be indicted for high treason, &c. shall have a true copy of the whole indictment, &c., delivered to him five days at least *before he shall be tried* for the same. 2 Hawk. P. C. ch. 39. sec. 14. p. 567.

By the statute 7 Anne, chap. 21. sec. 11, it is provided, that " copies of all indictments for high treason, &c. with a list of the witnesses, jurors, &c., shall be delivered to the party indicted ten days *before the trial.*" 2 Hawk. ibid. sec. 16.

In the margin 2 Hawk. ch. 39. sec. 14. there is this remark on the words *" before the trial,"* above recited. " This must be intended five days before *arraignment,* because the prisoner pleads *instanter* upon the arraignment." See Lord George Gordon's case, (accord) Doug. 591.

" As the intention of this clause in granting a copy of the indictment is merely for the sake of enabling the person indicted to plead, it has been holden, that no person *after having pleaded* to an indict-

Upon these grounds the counsel did advise the prisoners that they were under no obligation to plead *instanter*, upon their arraignment. They had a legal right to refuse to plead, and cannot be deemed by the

nent, is entitled to have a copy thereof."—6 Gwill. Bac. Ab. 545. *Tit. Treason* (Cc.).

" No exception can be taken to the fulness of a copy of the indictment fter the indictment has been pleaded to."—Rookwood's Case. 4, State Trials, 646."

N. B.—One of the copies *actually delivered* in these cases was *essentially variant from those on file*, by omitting technical words, the omission f which would have been fatal after verdict, but according to the course .dopted, the party had no opportunity to raise this objection. The other opies did not come to the hands of the counsel.

" *If the prisoner pleadeth* without a copy of the *caption*, &c. he is too late to make that objection, or *indeed any other objection that turneth upon defect in the copy;* for by *pleading* he *admitteth that he hath had* a copy ufficient for the purposes intended by the act."—Foster, ch. III. page 230.

" By the letter of the act, the copy is to be delivered five days *before* he *trial*. But upon the true construction of it, the copy, after the bill is ound, for till then it is no indictment, ought to be delivered five days be-re the day of *arraignment*, for that is the prisoner's time for pleading. .nd the five days must be exclusive of the day of delivery and the day f arraignment. So with regard to a copy of the panel, &c. *These ints have been long settled, and are now matters of constant practice.*"— oster, 230.

By necessary construction the ten days mentioned in the statute, 7 nne, ch. 21. s. 11. must be reckoned after the bill is found, and *before* the *rraignment* of the prisoner; for until the finding of the bill there is no dictment, and upon the arraignment, the prisoner must plead *instanter.*" -1 Chit. C. L. 405—1 East's P. of the C. 112.

These ten days must be reckoned exclusive of the day of delivery and arraignment, and also, exclusive of an intervening Sunday.—1 Chit. )5.—Foster, 230.—1 East. P. C. 112.

" *After pleading,* it is too late to object either to the *want* of a copy, or an insufficiency in it; for that admits it to be sufficient."—I East, P. C. .3. cites Gregg's case, 12th January, 1707. MSS.—Cook's case, Salk 634. ases of Rookwood and others, 4 State Trials, 661—And case of May, ias Smith, and others, April, 1708.

In Cook's case, Salk 634, after jury called, Sir B. Shower, counsel for e prisoner, objected to the trial at that time, because he had not received copy. The court replied, that the object of the act of 7 W. 3. was to able the prisoner to plead from the copy " *and till then he is not to plead*: this case he *has* pleaded. *Therefore this benefit is waived, and the pris-* er *has admitted he has a copy, and did not think it for his service to re-* ire *it; but was able to plead without the help of it.*"

N. B. The act of 7 Will. 3. made it necessary for the prisoner or his unsel to demand a copy. This was altered by the stat. 7 Anne, from hich the act of congress is copied.

In Dr. Hensey's case, 1 Burr, 643, the indictment was brought into urt on Tuesday, 2d May. He was not arraigned until the succeeding onday, May 8th; five days having been allowed for the service of a py of the indictment, pursuant to the act, 7 Will. 3. and he was allowed til Monday the 12th of June following; more than a month, by lord

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

.court, standing *wilfully* mute; nor ought this exercise of a legal right, t[
debar them from any indulgences which the court might otherwise fee[
disposed to extend. As well might they provoke the court by refusin[
to plead *guilty.* At present we are not prepared to advise the prisoners
nor to undertake their defence, in justice to them, or to ourselves. Fo[
my own part, I can assure the learned attorney general, that I came int[
the cases after the indictment was found, and only an hour previous t[
the arraignment; and that I know of no other systematic delay but wha[
proceeds from a fixed purpose to obtain a fair trial according to the con[
stitution and laws of the land. I am sorry *their* provisions seem to[
dilatory in a case involving the life of the citizen.

*Mr. Kell* said, on the part of the government, the attorney general an[
the district attorney, the gentlemen may now enter a plea in chief.

In reply to Mr. Kell, Mr. Mitchell observed, that the arraignment w[
altogether irregular and illegal, directly in the teeth of a public act of con[
gress, of which the district attorney was bound to take notice; that [
would certainly have been deemed an act of supererogation on the pa[
of the prisoner's counsel to have volunteered an advice or informatio[
to the district attorney, apprizing him how he could *regularly* convi[
their clients. Here was no ground to presume mistake or surprise, f[
he could not but know that two days had not elapsed between the i[
dictment and the arraignment.

*Mr. Glenn,* the district attorney, said the gentleman ought to kno[
that the prisoners were arraigned by the order of the court, that he ha[
nothing to do with it, and that all the proceedings were by their order. [

The Court observed, that the whole proceedings have been strictly re[
ular, and they were satisfied they had given the prisoners all the priv[
leges they were entitled to; and they meant to allow them all the priv[
leges and advantages they can legally require.

The clerk proceeded in swearing the jury, and after three of the jur[
were sworn,

*General Winder* addressed the court to the following effect:  H[
thought proper to state, that he was himself entirely unprepared, as [
what advice he ought to give the prisoner in the present situation of t[
trial, from want of opportunity to examine, and consider the subject; a[
this also is the situation of the other gentlemen concerned for the pris[
ner; they, therefore, with himself, desire it to be understood that they [
longer consider themselves as taking a part in this trial.

*Jury Sworn, viz:*—John Kennedy, Robert N. Moale, John Robinso[
John Carter, John Watson, Thomas W. Peyton, John Snyder, Isa[
Dickson, Thomas W. Bond, Thomas Wooden, Richard B. Dorsey, G[
Timanus.    ◦

*Mr. Glenn,* (district attorney) opened the case to the jury, by detaili[
the facts that would be proven, which could not leave a doubt on t[
minds of the jury, as to the guilt of the prisoner. He then read the la[

Mansfield, to prepare for his trial, without any application  on his p[
whatever.

It appears, then, that according to the established construction of t[
words contained in the act of congress, if a copy of the indictment h[
been actually served on the prisoners the same day the indictment w[
found, viz. Monday, May 4, they could not have been regularly [
raigned until Thursday, May 7th.

under which the prisoner was indicted, which is in the following words:—

*Act of April* 30th, 1810. Sec. 19. "That if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders, shall on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death : or if in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy, by the use of dangerous weapons, such offender or offenders shall suffer death."

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

The following witnesses were then examined.

*David Boyer sworn.*—I was driving up the mail between 10 and 11 o'clock on the night of the 11th March, Mr. Ludlow was with me, a fence was across the road which stopt the leaders, three men came from behind it, and said "here we are, three of us, highway robbers, armed with double barrelled pistols and dirks." They took us into the woods and tied us. They then went to the waggon and drove it into the woods; after which one man jumped into the waggon, and threw the mail on the ground, and put a knife into it, and they went to work; they were at work for a long time opening the letters. When they were done, they untied us, and told us to turn our backs to the tail of the waggon, which we did, and they tied us there. One of them said, " driver I am sorry you have been kept so long, here is some money for you to buy bitters." He gave me ten dollars, and said the person that was along with me looked like a gentleman, and did not want any money. Each one had a pistol when they tied us; they asked me which was the fastest horses. Their faces looked black, but from their hands I saw they were white men, and they called each other by the names Gibson, Johnson and Smith. One of them said, what shall we do with these men; another answered, I know how to fix them. I was anxious to know. This alarmed me very much. I gave up the mail because I was afraid of my life; they did not say they would kill us. I was much alarmed, because I did not know what moment they would kill us. They went off on the horses. After some time the witness released himself with his teeth, and with Mr. Ludlow proceeded to Havre-de-Grace.

*Thomas Ludlow, Esq. sworn.*—I left Baltimore on the 11th March last, in the mail waggon. When within two miles of Havre-de-Grace, our progress was impeded by a fence built across the road. Upon driving up to the fence, three men jumped from behind it, on the right side of the road, presented pistols which were cocked; said they were highway robbers, and would blow our brains out if we made any resistance. I with the driver was then led into the woods, about sixty yards from the road, and tied to a tree. One of the men returned to the road and brought the mail waggon into the woods, and removed the fence from the road. The mail was then cut open, and the letters taken out, and a great number of bank notes found in them. They occupied about three hours and a half in searching the letters. The men searched us in the waggon, to ascertain if we had arms. After they had finished searching the mail, about two o'clock in the morning, the driver and myself were untied from the tree, and tied to the back of the

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

waggon. The horses were then taken from the waggon, and they gallopped off towards Baltimore. The driver and I, after releasing ourselves from the waggon, proceeded immediately to Havre-de-Grace. After the prisoner was taken up, I returned to Baltimore, and went to the jail to see him. I had no recollection of his face, in consequence of its being blackened on the night of the robbery; but I very distinctly recognized his voice, which is peculiar. They used a phosphorus light to look at my watch; one remarked to the man who was looking at my watch that he was a fool, as I should see his face, but he put his hat over his face, so that I could not distinguish it.

*Mr. Wirt.*—Was the life of the driver in your opinion, sir, put in jeopardy?

*Witness.*—I beg leave to decline answering that question, unless the court should be of opinion that I am compelled to do so. The court decided the witness was compelled to answer the question.

*Witness.*—I did consider that the life of the driver was in danger had he made any resistance.

*Boyer* was called, by one of the counsel, on the part of the prosecution, and asked under what impression he gave up the mail; he repeated a part of the testimony, and added, I was a good deal alarmed; and when one of them said, what shall we do with these men, and the other answered I have got a way to fix them. I was very much alarmed indeed. I did not hear them say they would blow our brains out if we made resistance..

*Jacob Rogers,* Hatter, *sworn.*—The prisoner, with another man, pretty early in the morning on which he was arrested, came into my shop, and bought each a hat, and asked where they could get ready made clothes. I sent them to Berteau and Dumas's store. They had a great deal of money, in one, two and three dollars; it appeared to me of notes from Maine to Georgia. I saw no big money. Each one paid for his hat. I picked out the notes they paid me for the hats, as I was afterwards requested to do. They then went to Berteau and Dumas's where they were detected.

*Peter Berteau,* sworn.—The prisoner came to my shop, about 8 o'clock on the morning of the 13th March, with another man, both badly dressed. I was alone. They asked me for blue frock coats. I asked if they wanted blue superfine ones; they answered, yes. The prisoner went to the door, where there were two Scotch plaid cloaks, and asked the price. I told him 35 dollars a piece; he said he would give sixty for both I said, as they would buy other clothes, he might have them. This was about the time when Mr. Dumas came down from his breakfast. I told him to look for a coat that would fit the youngest one. I told him in French that they were men that would buy, that they had already bought two cloaks for 60 dollars, and that I suspected they had the money of the mail, that had been robbed the day before, in their pockets. Dumas told me to say nothing about it, until we could see with what money they could pay their bills. About this time a constable came in, and asked me if I knew the object of his visit? He began to question the men. I took him apart, and told him we were not ready, and requested he should wait till we should be ready. They continued purchasing clothes; the constable came in a little after,

and without inquiring if we were ready, told them the mail had been robbed; it appears you are strangers in this place, and it is my duty to bring you before the court. They said they had not heard the mail was robbed. They went into the back shop, where Mr. Dumas had the clothes they had bought.

*Peter Dumas, sworn.*—It was on the 13th March last at about a quarter past eight o'clock in the morning, passing through our store I saw two men very commonly clothed, busy buying of my partner some clothing. Having previously read in the newspaper an account of the mail robbery, it came directly to my mind that there was all possibility of these men having executed this robbery. I passed my way to the back shop, my partner came to me and said, these are the mail robbers, they are buying a great deal. I directly answered very well, they are our's. After a moment's stay in the shop I came up to one of them, so as to help with the sale of the goods; seeing that every article offered was instantly bought. They never minded the prices; and what made me suspect them more, is that when asking them to try the pantaloons, they refused, telling me to take measure, and apply it to the pantaloons they had on. While in the act of taking measure, I felt a great abundance of papers in the pockets of the pantaloons, which induced me to be easy with them in all my endeavours, so as to bring those papers to light. I immediately let them at liberty to act as easy and freely as I would have done to any honest people. After a moment two officers came in, and asked them if they could give satisfactory references who they were, they answered in the affirmative; the officers said, we are officers, the mail has been robbed, and it is the duty of the people to take every person suspected, to be examined. One of them called for the bill; one bill was ready. I took them into the back shop, and counted out the goods. I placed myself opposite a large looking glass in the shop, that I might see. I saw one step behind the curtain which hangs on one side of the shop; he put his hands into his pocket, pulled out the money, and placed it between some cloth that had been cut out, and between some pantaloons that were lying on the counter; the other then emptied his pocket in the same way. One of them then asked me what they should do; I told them to go to court and be examined. When they had left the shop, I went to the clothes and took out the money they had deposited there, and took it up to court. When one of them was emptying his pocket, I heard a pistol ball and dagger fall, which I found on the floor. Both men had mud on their pantaloons as high as their knees, when they came into the store.

On leaving the store, one of them seized my right foot by laying his on it, knocking me with his elbow, and showing me with his eyes the place of deposite; leave the goods, said he, and I will call for them. I told the clerk, we have money enough in the house, and I called a gentleman passing to step in so as to witness, while taking possession of the money.

*Alexander H. Boyd, Esq. sworn.*—I was in the room where the prisoner was examined; this note ( *a one hundred dollar note, which was afterwards proved to have been robbed from the mail,*) fell from him as he was pulling off his pantaloons; his person was much chafed.

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

*D. Bell, Jr.*—I put this note, (*the note above mentioned*) into the post office in Charleston, on the 4th March last. I also put into that office, at the same time, these notes, (*taking up some of the notes that were deposited among the clothes in the shop of Berteau and Dumas.*) These notes were directed to Churchman and Thomas, Philadelphia.

Col. *Bentalow*, the marshal, sworn.—I examined the prisoner, he was much chafed, as if he might have been riding on a bare-backed horse; this note was dropped from his pocket, which Mr. Boyd picked up; there was horse hair on the seat of his trowsers.

[Several witnesses were then called to prove that the notes found at Berteau and Dumas' store, where the same that were brought into court.]

*Andrew Rhoads.*—I saw the prisoners in Havre-de-Grace on the 11th March last, at 12 o'clock at noon, in the high road with two other men. They asked me how far it was to Baltimore. I told them. They then asked whether there were any bridges washed away between there and Baltimore? Whether stages came that way? I told them only the mail stage travelled that road; they asked me the time that it came, and I told them.

Here the testimony on the part of the United States closed. The prisoner produced no witnesses.

Mr. *Ludlow* was called, and asked if the prisoner had a pistol. This man had a pistol; after we had left the road, he told me that "if we made no resistance I need not be alarmed, our lives should not be in danger.

*Thomas Kell, Esq.*—The testimony being closed, Mr. Kell addressed the court to the following effect:

He said that having now progressed through the evidence to be offered in the case, it was not the intention of the attorney general, the district attorney, or of himself, further to press the calamity of the prisoner by observations on the testimony. But they felt it incumbent upon them, and proper to relieve the jury from any doubt or difficulty, as to the law upon this subject. Whilst, therefore, they should decline saying any thing to induce the conclusion at which they had no doubt the jury would arrive, they would ask of the court the following direction:

"It is prayed of the court to give the following instruction to the jury.

That robbing the carrier of the mail of the United States, or other person entrusted therewith, of such mail, by stopping him on the highway, demanding the surrender of such mail, and at the same time showing weapons calculated to take his life, such as pistols or dirks, putting him in fear of his life, and obtaining possession of the mail by the means aforesaid, against the will of the carrier, is such a robbing of the mail, and such a putting the life of the carrier or person entrusted therewith in jeopardy, by the use of dangerous weapons, as will bring the offence within the following terms of the 19th section of the act of congress of the 30th April, 1810, entitled, 'An act regulating the post-office establishment,' to wit: or if in effecting such robbery of the mail the first time, the offender shall wound the person having the custody

thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death."

*Mr. Kell* then read the 19th section of the post office law.

*Act of April* 30, 1810, *Sec.* 19.—" That if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death: or if in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy, by the use of dangerous weapons, such offender or offenders shall suffer death."

He then disclaimed all idea of influencing the determination of the jury, whether the acts proven bring the transaction within the meaning of the act of congress. And proceeded to inquire what is the putting life in jeopardy by the use of dangerous weapons?

1. The weapons used.
2. The manner of using them.
3. The alarm of the carrier.

It appears, said Mr. Kell, all necessary to constitute the offence is proven. The party met the driver in the night, on the highway, proclaim themselves highway robbers; that they are armed with double barrelled pistols and a dirk, that the pistols were cocked. It was then ascertained that they were armed with pistols, which were presented towards the driver and passenger; and soon after, that they had a dirk. The exhibition of such weapons, the purpose for which such exhibition was made, does create danger and risk of life; in other words, it does jeopardize life. It certainly was a putting the life of the driver, (as well as of Mr. Ludlow,) in jeopardy: did it not diminish their personal saftety, and expose them to hazard?

It perhaps is not necessary that the driver should have apprehended his life to be in danger. If it were so, the language and requisites of the law are fully proven; he stood in the predicament of a man whose life was in danger, and under the fear and apprehension of danger, he parted with the mail.

The prayer presents the case in the fairest and most favourable manner for the accused.

The weapons used are such as are eminently calculated to endanger life, or put it in jeopardy; the pistols were cocked and presented, with the declaration, "if you resist, we will blow your brains out." This, 'tis true, the driver says he did not hear, but he heard and saw enough to produce fear, and therefore gave up the mail; can it be thought by any deliberate mind that such acts, for such a purpose, do not endanger life, or put it in jeopardy? Can it be said that the life of a man situated as was that of the carrier of the mail, at the time of this transaction, was not in danger? It is not necessary that the pistol be discharged; intimidation and danger, by such means, are sufficient to constitute the offence; the jeopardy of the life takes place at the moment when the weapons are presented.

With this view and consideration of the subject, Mr. Kell felt

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

himself authorized to ask the opinion and direction of the court, contained in the prayer submitted to them.

*Gen. H. M. Winder* hoped the court would not deem it irregular or improper for him, after what had occurred, to suggest his views to the court as amicus curiæ on the question now propounded by the counsel for the United States. Indeed, having been called upon by the prisoner, although at too late a period to be prepared to advise him preparatory to, or in the conduct of the trial, yet, he had deemed it his duty to listen attentively, and he thought, if any thing occurred to his mind of real importance to the prisoner, he was bound in duty, both to the court and the prisoner, to state it. He had never seen the clause of the act of congress until the trial commenced, and received from that perusal a very strong impression that the evidence did not support those counts in the indictment which charges the prisoner with a capital offence. This impression had been strengthened by the little reflection he had been able to bestow upon it, and more strongly confirmed by what he had heard on the part of the United States. The words of the act of congress are—"if in effecting such robbery, &c. &c. [See p. 311.]

Now, the life of the carrier must be put in actual *jeopardy* to bring the offence within that alternative of the clause; no *apprehension* of danger, or being put *in fear of his life*, satisfies the words of the act. The terms of the prayer to the court are a fair and just statement of the extent to which the testimony in this case can be urged, and by the very terms of the prayer no jeopardy of life is even supposed; it simply states, that *if the prisoner exhibited dangerous weapons calculated to take life, thereby putting the carrier in fear of his life, and thus obtaining, &c.*, can it be supposed, for a moment, that this is what is meant by congress when they say, put the life of the carrier in *jeopardy?* It would be to attribute to congress the most loose and unskilful use of terms; to make the *apprehension* of danger the *existence* of danger; the *fear* of jeopardy *actual* jeopardy. It is wholly impossible to contend that the words do not import an actual jeopardy; and if they do, surely the assumed state of proof in this prayer does not amount to actual jeopardy.

If the position contended for be true, it will follow, that a man may be guilty under this part of the act where no jeopardy of life has occurred; and if the prayer exhibits the just interpretation of the act of congress, a robber may put the life of the carrier in *actual* jeopardy without being guilty; for if he raises a *fear* of life, by having dangerous weapons, without doing any act which could possibly put life in jeopardy, he is guilty; but if a robber in the dark, without the carrier's knowledge, snaps a loaded pistol or gun within killing distance, with intent to kill the carrier, no body will doubt but here was *actual jeopardy;* but the carrier could not possibly have any fear of life, since he had no knowledge of it; and if the mail should be immediately stopped by the robber and his associates, without farther acts of intimidation, the party would not be guilty under this clause; can it be imagined that a construction leading to such absurdity can be just?

To support the construction contended for, it is necessary to con-

found *fear of life* with *jeopardy of life.* Now, since a man may be in *great fear of his life,* where there is not the least *jeopardy of life,* so there may be *great jeopardy of life,* without the least *fear of life.* To say that congress, therefore, meant *fear of life* by *jeopardy of life* is inadmissible, especially in a criminal statute. But farther, this *jeopardy of life* must, by the express terms of the act, be created by the *use of dangerous weapons.*

What is the *use* of dangerous weapons which can occasion *jeopardy* of life? certainly they must be so used, as that life may be destroyed; as if a man strike at another with a sword, or fire or snap a loaded pistol or gun at him within reaching distance; this is clearly a *use* of the weapon that puts life in jeopardy. But if a man had a sword by his side, or a pistol in his belt, and he stops the mail, and says to the carrier, you see I am armed, deliver the mail, the carrier might justly be said to deliver the mail in such case for *fear of life;* but can it be said, that in effecting this robbery the carrier's *life was put in jeopardy* by the *use* of dangerous weapons? It is impossible that it can.

Then if there be no ambiguity in the words of the statute, which it is respectfully believed there is not, how can any interpretation, especially in such case as this, be admitted different from these words?

The *use* of dangerous weapons to produce *fear of life,* may be very different from the *use* of dangerous weapons to put life *in jeopardy;* but nothing in this act can render a man guilty but such a *use* of these as puts life in *jeopardy.*

The facts in this case ought, therefore, to warrant the counsel for the United States to ask the court to direct the jury, that if they believe the prisoner had dangerous weapons, which he used so as to put the carrier's life in *jeopardy,* then he is guilty, otherwise the court cannot instruct the jury to find a verdict of guilty on this point.

General Winder concluded by remarking to the court, that this view of the subject appeared to his mind very strong, and he thought could not but have strong weight with every unprejudiced mind; and since upon so hasty a view of the question, such strong motives of doubt, to say the least, had occurred, he trusted the court would, in the forlorn case of the prisoner, being without counsel prepared to assist him, incline to the side of mildness; but at all events, if the learned attorney general should be able to incline the balance against the prisoner, he respectfully submitted, whether the question was not so doubtful as to require the court to put it in a situation to receive the deliberate judgment of the supreme court, before the life of the prisoner should be taken.

*E. L. Finley, Esq.*—He contended that congress, in using the words, " jeopardy of life," did not intend that the mere *presentation* of a pistol or dirk at the mail driver, without wounding him, should be such a " jeopardy of life," as would subject the party to the punishment of death; that the words, " *wound* the driver, or *put his life in jeopardy,*" were used by them as *convertible* and *synonymous* words; that the words " put his life in jeopardy," were intended as *explanatory* of the words " wounding the driver," and defining and limiting their extent. Congress (said Mr. Finley) intended that

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

the *wounding* should be such as would put the life of the driver in *jeopardy*. They may have supposed that some doubts might arise upon the construction of the words *wounding*, and as to the *nature* and *extent* of the *wounding*. They, therefore, inserted the words 'jeopardy of life,' as explanatory, and to show that unless the wounding was of so serious a nature as to *jeopardise* life, the party should be subject only to imprisonment. The use of the disjunctive particle *or*, does not necessarily make them two distinct offences. Mildness and humanity are the distinguishing characteristics of our criminal code. The number of offences to which the punishment of death is annexed is very limited: and it is only where the offence is of a very aggravated and criminal character, that this humane consideration for the lives of the citizens has been departed from. The act of 1810 was intended as an *amelioration* of the former post office act. The act of 1794, section 17, annexed the penalty of *death* to a *simple* robbery of the mail, *unaccompanied* with *injury* to the *driver*, or the *use* of *dangerous weapons*. This severe punishment was considered as disproportioned to the offence. This act was repealed by that of 1810, which in the first clause of the 19th section, provides, that for a *simple* robbery of the mail, the party guilty shall be subject to 10 years imprisonment. Congress have determined, therefore, in this clause, by the *punishment* annexed, the *degree* of enormity they attached to a *simple robbery* of the mail. As then they did not consider it such an offence as to deserve death, they must be presumed to have intended, that unless the offence was *attended* with very *aggravating* circumstances, such as jeopardising the life of the driver by seriously wounding him, the punishment of death should not be superadded. This would be, in my opinion, an humane and reasonable construction of the act of congress. But if your honours should establish the construction contended for by the counsel of the United States, viz: that wounding and jeopardising are two distinct offences ; this act loses all its character of mildness, and would deserve to be enrolled in the bloody code of Draco. You could not undertake to graduate the degree of wounding. But if in effecting the robbery of the mail, the party should wound the driver slightly or seriously—no matter whether in consequence of such wound his life should be jeopardised or not—it would be perfectly immaterial, and you would be obliged to inflict upon the party robbing the punishment of death. To show then, the absurdity of this construction, and its incompatibility with the object which congress must have had in view in making this provision of the act of 1810, viz: the amelioration of the act of 1794, punishing simple robbery with death.—Suppose that in effecting the robbery of the mail, the robber should make a slight and trifling puncture with his dirk in the flesh of the driver; should scratch the face or cut the skin of the driver, or some other slight wound, which could not, by any possibility of construction or inference, *jeopardise* his life. Would this be a circumstance of such aggravation, of such enormity, as to entirely change the character or degree of the offence of simple robbery, to enhance its criminality, and to give to it such an increased and outrageous degree of wickedness, as to require the proportionably severe punishment of death? Is it equal in criminali-

ty, and does it call for the same degree of punishment? Would this be an amelioration of the act of 1794? Heaven protect us from such an amelioration! But if the construction contended for by the counsel of the United States be correct, the slightest scratch or puncture given to the driver, or the mere presentation of a pistol or dirk, without wounding him, changes the mild character of the law, and subjects the party to death. Where was, then, the necessity of repealing the 17th section of the act of 1794, and substituting the 19th section of 1810? The act of 1794 makes no mention of dangerous weapons; it simply speaks of the robbery of the mail, and whether the robbery was effected by the use of weapons or not; the punishment was death. But is it to be presumed that a highway robbery of the mail would ever be attempted without dangerous weapons, such as pistols and dirks? If the mere presentation, then, of dangerous weapons, without wounding, attaches death to the offence, the first clause of 19th section of 1810, punishing a simple robbery, would be entirely nugatory and superfluous; as no robbery ever has, or ever would be committed without dangerous weapons. Can we suppose, then, that congress had no object in view in making this provision, and drawing a distinction between a simple robbery, and one accompanied with wounding?

Mr. *Finley* then observed, that he had always understood it to be an established principle, in all our courts of criminal judicature, and one from which courts or juries could not deviate, that the most favourable, the most refined, the most extended construction, should always be given, in " *favorem vitae*," to all penal acts. That too much value and consideration were attached to the life of a fellow creature, to permit it to be "*jeopardised*," or taken away on account of indistinctness or ambiguity in the phraseology of a law. That when the provisions of a law appeared to be unusually harsh and severe, and repugnant to the general character and habits of the people, and a construction in "*favorem vitae*," could be collected from the probable intention of the legislature that enacted it, that then such *intention* was to be the *rule* of construction. That the law of 1810, in the severity of its provisions, *as contended for*, was an anomaly in our criminal code; an isolated bloody statute, assimilating with nothing around it. That the most effectual mode of ascertaining the intention of congress, at the time of passing the law, and truly determining the construction they intended should be given to it, would be by examining the *operation* of the law, and comparing it with the *policy* which congress must have had in view in repealing the law of 1794, and substituting that of 1810.

Mr. Finley then took a view of the laws of England and France on the subject of robberies; of the respective *policy* of those laws, and their effect upon those two nations.

In France, said Mr. Finley, a robbery *unattended* with *murder* of the person robbed is punished by fine and imprisonment; if accompanied with murder, the punishment is an ignominious and painful death. In England, a simple robbery, whether accompanied by murder *or not*, is punished with death.

What has been the effect and operation of these several laws? In France, all temptation to *murder* the person robbed is taken away; the fear and the interest, if not the humanity, of the robber

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

are enlisted and appealed to. The law says to him, if the robbery you commit is *unattended* by murder, if it is not *aggravated* by taking away the life of a fellow creature, we will reward you for your forbearance by respecting your own life. But if it is attended with the horrid and unnecessary crime of murder of your victim, the severest punishment which the law can inflict, viz: the deprivation of life, shall be the consequence of your cruelty. In England, no distinction of punishment is made between robbery with and without murder; and the highwayman, who probably impelled by the severest want, takes from you your purse, without endangering your life or even using any personal violence, and the hackneyed and hardened villain, who, to pamper and gratify his profligate passions, not only robs you of your purse, but deliberately and unnecessarily takes away your life, are alike involved in the same punishment, and punished in the same degree, notwithstanding the great disparity in the two crimes. All inducement to spare the life is therefore taken away for want of this discrimination. The highwayman, in the first instance, knows, that if he spares life, he leaves a witness to proclaim his crime, and to rise up in judgment against him when detected; that the law will not mitigate the severity of its punishment on account of his forbearance; but that if he murders his victim, he saves his own life, by silencing the only witness that could appear against him at a human tribunal. The consequence of this discriminating policy of the French law is, that scarcely an instance occurs of the perpetration of a robbery, accompanied with murder; whilst the lamentable result of the mistaken and barbarous policy of the English law is, that murder is almost inseparable from, and concomitant with highway robbery; and the criminal annals of England furnish a bloody calendar from one year to another. May not congress then have had these several results of European policy in view at the time of passing this law? Would they not profit by experience? The object of their legislation was the public good, and the reformation of criminals. But it would be charging them with a most culpable disregard of the lives and safety of their fellow citizens, to suppose that they would be uninfluenced by the consideration of these several results. A reference, however, to the actual operation of the act of 1794, furnishes an additional and conclusive corroboration of the construction I contend for, and of the intention of congress to ameliorate the act of 1794 by that of 1810; for during the existence of the first act, several attempts at a robbery of the mail were made, and in almost every instance it was attended either with the murder of the driver, or the dangerously wounding of him.

In the instance of the robbery of the Richmond mail the driver was murdered.

Mr. Finley then observed, that the construction he had contended for, he conscientiously believed to be the true and correct one; but that, as he might be unsuccessful in his attempt to transfer this conviction from his own mind to the minds of the court, and as the counsel for the United States had contended for a different construction, he would make a brief reply to one of the arguments of the counsel, and then relieve the attention of the court. The counsel for the United States, said Mr. Finley, have contended, that the mere apprehension, or opinion of the party that his life was

BALTI-
MORE,
May, 1818.

United States
Hare.

in danger, was to be the criterion by which the jury was to determine whether his life was put in jeopardy, within the meaning of the act of congress. This, I conceive, to be a most absurd and fallacious criterion. It would require a scale in every instance by which to graduate the fears of the party robbed. Some persons are operated upon by fear more easily than others. Such is the constitutional timidity of some persons, as to magnify mole hills into mountains, and to people every bush with midnight assassins and robbers; should the driver be of this description, his life would be in continual jeopardy, according to this construction, while travelling on his route. The counsel have not properly discriminated between the mere fear or apprehension of danger, and the actual existence of danger—a man may anticipate danger, when no danger exists. I will give but one example in illustration of this distinction. Suppose a man presents a pistol which is not loaded, at the breast of another, (who is ignorant of its not being loaded) and in a threatening manner says, that he will blow his brains out. In this case, the party to whose breast the pistol is presented would most assuredly apprehend that his life was in great jeopardy, though the jeopardy would exist only in imagination.

*Mr. Finley* then laid down a distinction between the jeopardy of the driver's life, and the life of Mr. Ludlow. He contended that under this act, it was perfectly immaterial whether Mr. Ludlow's life was *jeoapardised* or not. That the act only extended to the driver's life, and expressly confined and annexed the punishment of death, to cases of robbery, when the driver was wounded, or his life put in *jeopardy*. That this was an important distinction to be kept in view by the jury, in the examination of, and decision upon the testimony in this case. That there was a manifest difference in the testimony of Mr. Ludlow, and of the driver. That, although Mr. Ludlow swore that he considered his life in great danger, yet the driver swore that he felt no apprehension of danger to his life, until after the robbery was effected, and that his apprehension arose from an observation by one of the robbers, 'what shall we do with these men,' and the reply, 'I have a way to fix them;' but that his fears were removed, when he found, that 'the way to fix them,' was by tying them to the tail of the mail waggon. That he did not intend, by adverting to this difference in their testimony, to impeach the credit either of Mr. Ludlow, or the driver, but to show, that whatever may have been the apprehensions of Mr. Ludlow, or however his life may have been *jeopardised*, yet, that the driver's life was not *jeopardised;* neither did he feel any apprehensions of it.

*William Wirt, Esq.*—He hoped the opposite counsel would both excuse him, for observing, that they did not appear to him to have found the key which unlocked the construction of this law, in a manner the most simple and natural. They seemed to have taken it for granted, that congress intended to describe, by this section, a new kind of robbery, unknown to the common law, and which called for a different kind of proof. From this opinion, he begged leave to dissent. He contended, that congress had not intended to create a new offence, unknown to the common law, so far as the circumstances attending the act, and the degree of proof were con-

BALTI-
MORE,
May, 1818.

United States
Hare.

cerned. That, although the mail was a species of property un-known to the common law, and congress, in making the mail a subject of robbery, had extended the offence to a new subject; yet that the character of the offence, *the robbery*, was the same, both at common law and under this statute; that the only effect of the act was to extend the offence to a new subject, leaving the character of the offence, and the degree of proof, exactly where the common law had left them, in regard to other subjects.

To make this clear, he begged the court to recollect, that wher-ever the constitution or laws of the United States used a common law phrase, without any definition of that phrase, it was the uniform course to resort to the common law for its explanation. It was un-necessary to cite to this court, to whom they were familiar, the de-cisions which illustrated and proved this course; it was, indeed, impossible to conceive that any other could be adopted. But the court would observe that this principle was essential to the con-struction of this law, and that it demonstrated the truth that a new kind of robbery was not intended to be created. For in the first part of this section, the term *robbery* is used without any definition. The words are:

*Act of April* 30, 1810, *sec.* 19.—" That if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offen-ders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suf-fer death; or if in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death."

Thus far the provision is general, by the use of the term *robbery*, which is left unexplained; a resort must, therefore, be had to the common law, from which it is borrowed, to explain it; and every species of robbery known to the common law is clearly embraced by the clause just quoted. If the court will attend to the structure of the sentences, which follow this first sentence, and which are sup-posed to create a new offence they are merely exceptions from the first sentence, and were consequently included in it, until so excep-ted: if the first sentence therefore covers, and merely covers the common law offence of robbery, and the latter are only exceptions from it, these exceptions are merely parts of the common law of-fence of robbery, and consequently no new offence, and calling for no new and more aggravated degree of proof. Again, if you recal the different species of robbery as they have been decided to exist at the common law, you will perceive that the sentence, on which the two first counts of the indictment are founded, describes a kind of robbery perfectly familiar to the common law.

At the common law, robbery might be committed, 1st by *violence*, without putting life in danger, and without previous fear; the lady whose ring was snatched from her in some place of public amuse-ment, and dropped among the curls of her hair, was decided to have been robbed, although there was no danger of life, and no previous fear operating on her will, to cause a surrender of the property.

2. By fear for reputation; as by a threat to charge the party with an infamous crime unless he should surrender his purse; in this case, there is no violence offered to the person and no danger to the life, yet the robbery is complete—it is the lawless constraint acting on his will, from regard to his character, which induces the surrender of his property, and which constitutes the offence. 3. By fear of personal violence; but this must not be the groundless fear of cowardice; the law requires that the danger should be apparent, and hence circumstances are always required to show that the fear was well founded; this was the kind of robbery in the contemplation of congress in the sentence under consideration.

They have stated the evidence which shall show that the danger was real, the fear well grounded; wounding the driver, or (without wounding him) *putting his life in jeopardy, by the use of dangerous weapons.* The robber, who, with a pistol, stops a traveller on the highway, and demands his purse (a case familiar to the common law courts of criminal jurisdiction in England,) presents the very case put by the act of congress. The weapon used is a pistol; a weapon fabricated for the very purpose of danger to life; it is used because it is dangerous; and the use produces the effect intended, by acting on the fears of the traveller, and inducing him to surrender his purse, by reason of the jeopardy to his life. There is nothing in the descriptive circumstances of the offence under the act of congress, to distinguish that offence from the high-way robberies once so common on Hounslow Heath and Bagshot in England.

But it is insisted on the other side, said *Mr. Wirt,* that something more is meant by the expression *putting the life of the driver in jeopardy by the use of dangerous weapons;* it is not enough that the robber be in possession of the dangerous weapons; it is not enough that he carry them to the ground; it is not enough that he perpetrates the robbery by the terror which they inspire; but they must be used in such a way as to produce jeopardy; for example, if the weapon be a dirk, a stroke must be made with it; if it be a pistol it must at least be snapped. Let us examine some of the consequences of this construction. If a stroke be made with a dirk at right angles from the driver, it is not easy to conceive that greater jeopardy is produced thereby, than by the mere possession and display of the weapon in the robber's hand; such a stroke would be nothing more than a flourish, *in terrorem;* if the stroke be at an angle of forty-five or twenty-two and a half degrees, the same answer might be given to it; and so through all the gradations of angular distance; if the stroke miss the object, and be not repeated, the jeopardy is over, a miss we are told being as good as a mile, or if gentlemen think this answer too light, is it not obvious that by insisting that the stroke shall, at all events, be made, in order to constitute the jeopardy, they force the court and jury upon a mathematical disquisition as to the distance and the direction of the stroke, in order to jeopard the life? points extremely difficult of ascertainment, considering that their attempts are generally if not always made in the night time, when the distance and the direction, and even the fact of a stroke being made at all, can rarely be discerned. As to the snapping of the pistol, all the remarks made upon the direction of a stroke with a dirk apply, and indeed it is not very

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

easy to discern, even if the pistol be levelled at the driver's head, how its having been snapped increases his jeopardy after the snap is over; besides, the chances are sadly against the calculation, that a pistol prepared for a robbery will snap; the probability is that it will go off; and then there is no jeopardy, for jeopardy implies uncertain danger, whereas, on this supposition, the hazard is reduced to a doleful certainty; the driver is killed. Can it be believed that this was the intention of congress? Can it be believed that any thing more was meant than that the robbery should be effected by the use of dangerous weapons, of weapons calculated to take life?

But still bolder ground is assumed on the other side; it is contended that in this case there was no jeopardy to life, because the robbers gave the assurance that if the driver and passenger would not resist they should not be hurt; it may be very true, gentlemen say, that if they had resisted they would have been killed; but they had only to give up the mail without resistance and there was no jeopardy at all; and hence the case is not within the act of congress. This is the construction given to an act of congress intended to prevent robberies! Sir, it must be very clear that the jeopardy within the contemplation of congress was that kind of jeopardy which was in no other way to be avoided, than by yielding to the lawless purposes of the robber; a jeopardy of life so imminent, that the driver could not elude it, except by surrendering that which the robber had no right to demand. This ground so intrepidly taken in the construction of our statute would be just as tenable under the English common law; for example, by that law it is required that the party shall be put in fear; but the courts there require that this fear shall have a reasonable foundation; the robber there might say, it is true I was armed, it is true the traveller was put in fear; but the case is not within the law, because his fear had not a reasonable foundation, for he admits, I told him I would not hurt him if he would surrender his purse. Such an agreement, I must be permitted to say, would make but sorry figure in Westminster Hall, or even at the old Bailey; for it goes to patronize and protect, not to prevent or punish robberies; it founds the robber's exemption from punishment on the very circumstance which constitutes his guilt—the success of the robbery.

The gentleman who urged his argument attempted to support it by a case from the law touching assaults and batteries, which he seemed to think analogous; that case is this: if a man were to lay his hand upon his sword, and say if it were not assize time he would not take such language; this the gentleman says, and says truly, would not be an assault, but why? for a reason which destroys the analogy; because the words show an absolute purpose to do him no mischief at that time; the forbearance is not put on the condition of any act to be done by the party menaced; but suppose the assailant had drawn his sword, and required the other to fall upon his knees instantaneously and beg his pardon, or he would run him through the body, when the gentleman shall show by authority that this would not be an assault, he will have furnished a case which does not present something like the appearance of analogy."

'The respectable young gentleman, (*Mr. Finley,*) who last ad- dressed the court, has insisted that the words "wounding the driver or putting his life in jeopardy by the use of dangerous weapons," mean the same thing; that the driver is, at all events to be wounded, and so wounded as to put his life in jeopardy; to this I think it sufficient to answer, that the conjunction used is the disjunctive *or*, and that according to all the rules of fair construction there were two cases in the contemplation of congress, the one wounding the driver, the other putting his life in jeopardy, by the use of dangerous weapons without wounding him. The aid which the gentleman attempts to derive to this construction from the act of 1799 is not in my opinion fairly furnished; the expression in that law is, "shall *much* wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons;" these were clearly distinct offences; in the present law, the word *much* is dropped, obviously because it was indefinite, and might lead to difficulties in the decision of cases arising under it, and because any wounding of the driver would be sufficient to show the wicked and determined purpose of the robber; but that purpose would be shown with equal clearness without wounding the driver, in effecting the robbery by the use of dangerous weapons calculated to take the driver's life.

If any doubt could remain on this subject, it would be removed by pursuing this section of the law a little farther. It appears, that robbing the mail, generally, is punished by the first clause of the section, only with imprisonment for the first offence; yet there were some modes of perpetrating such robbery so peculiarly obnoxious, that congress had singled them out by express exception, and punished the first offence committed in either of these modes with death:—congress have gone still farther, and punished even the unsuccessful attempt to commit the robbery, in either of these modes, with imprisonment for three years, and words in the section, in which the attempt is described, are intended to represent the same mode in which the act is described. So far as we have yet gone, the purpose is to punish the offence, if effected; congress next take up the attempt to commit the offence, where it fails. In defining the different modes of such attempts, they have kept up the analogy between the successful and unsuccessful attempts, and by a slight variation of language have thrown new light on the clause we are considering. The language of the law, where the offence is complete, is as follows: "If any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence: he or they shall suffer death; or if in effecting such robbery of the mail, the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death." I beg the court now to mark the correspondent description of the attempts. The words are these, "and if any person shall attempt to rob the mail of the United States by assaulting the person having custody thereof, shooting at him, or his horse or mule, or threatening him with dangerous weapons, and the robbery is not effected," &c.—Here it is clearly observable

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

that the *assault*, generully, meets the general description of the rob-
bery, in the first sentence; 2ndly, that the shooting, in the attempt,
corresponds with the wounding in the robbery; and thirdly, that
the threatening the driver with dangerous weapons, in the unsuc-
cessful attempt, corresponds with the putting his life in jeopardy,
by the use of dangerous weapons; thus the description of the at-
tempt, reflects light on the description of the act, and demonstrates
that congress, by using the terms " putting his life in jeopardy by
use of dangerous weapons," meant nothing more than " threatening
him with dangerous weapons," without having in view any other
use of the weapons, or any further degree of jeopardy. According
to the oposite construction, it would appear that congress had been
solicitous to punish this peculiar mode of attempting the robbery
with a peculiar punishment, distinguishing this kind of attempt
from any other attempt; while the actual perpetrating the robbe-
ry by the use of dangerous weapons was left unpunished by any
peculiar degree of rigor, thus convicting congress of an absurd so-
licitude about the attempt, without any correspondent solicitude in
relation to the act: and to produce this absurd consequence, you
are required to adopt principles of construction so subtile and met-
aphysical, as to what will or will not constitute jeopardy,, that there
are perhaps no twelve men in the community who will agree in
their application to the same case; if you take the plain case which
it seems to me was clearly before congress, that of robbing the
mail-upon the highway by the use of weapons dangerous to life,
every case which can arise is carved, and the act is in perfect harmony
with itself. By any other construction, the act is rendered imper-
fect, unjust, and absurd.

The same gentleman has animadverted on the impolicy of pun-
ishing with death a robbery which has not been attended with the
death of the party robbed, and he has enlarged on the different ef-
fects of the English and French law, in this particular. In the re-
marks which the gentleman made on this subject, he has presented
a pleasing proof of his habits of accurate and extensive investiga-
tion. In this case, however, it was misplaced; for it is an investiga-
tion of a legislative, not of a judicial character; whether the rob-
bery charged in the indictment ought, or ought not in good policy,
to be punished with death, is obviously a question for congress, not
for this court; for those who make laws, not for those who expound
them.

The same gentleman has commented on the particular facts of
this case, in his address to the court. This, also, was out of place.
The court have nothing to do with the facts; these belong to the
jury; we have not called for the court's opinion on the facts; we
have prayed merely for their construction of the law; should they
give it, as we have prayed, it will remain for the jury to say, whether
the evidence brings the case within that construction. Since, how-
ever the jury had, in effect, been addressed through the court, in
relation to the facts, he would barely remark, that, according to
the evidence of the driver, the mail stage had been stopped, about
midnight, by a fence purposely erected across the highway, that
immediately on its stopping, three men rushed from the fence to the
stage, declared themselves highway robbers; that they were well

armed with pistols and dirks, and had come to rob the mail; that the driver gave up the mail, through fear of his life, and that he saw the weapons in the hands of the robbers: this, we contend, brings the case within the construction of the act, for which we contend: the identification of the prisoner at the bar, as one of the three robbers, has not been disputed.

The gentleman made another remark to the court, intended, he presumed, to awaken the sympathies of the jury. The gentleman alluded to the peculiar manner in which this prosecution had been carried on, and represented these men as having been pursued *with fire and fury*. The remark had not been deserved by any thing that had appeared in the prosecution since he (Mr. Wirt) had come into it. The prosecution had on the contrary, been conducted with the utmost coolness and moderation: and he was well assured that its previous stages had been marked rather by excessive lenity and indulgence, than by a spirit of persecution.

*Mr. Finley.*—I am sorry to be obliged to interrupt the learned gentleman; but he has entirely misapprehended the nature and extent of my observations. I did *not* make any reflections upon *him*, for the manner in which the prosecution had been conducted. Such reflections would have been unjust and unfounded, as the learned gentlemen only this morning came into the case. I spoke of the *general* character of the prosecution, and of the powerful excitement of public feeling which threatened to overwhelm not only the prisoner at the bar, but the counsel who defended him; and which has manifested itself in a manner so general and so violent, as almost to preclude the possibility of a fair and impartial trial.

Mr. Wirt admitted that he had mistaken the gentleman. The popular indignation, however, of which the gentleman complained so vehemently, was certainly very natural, and he would add very honourable. It was the indignation of a virtuous people against a most flagitious and daring offence. He hoped never to see the day when the recital of such a crime would be heard with composure by the American people. It would be a mournful proof that our moral sensibility was gone. At the same time he should regret extremely that the indignation of the jury against the offence should mingle itself with their examination of the evidence against the person here accused: for it did not by any means follow, that because the offence was enormous the prisoner at the bar was the person guilty of it. He was to be tried by the judgment, not by the passions of the jury; he was to be tried by the evidence, and not by their feelings either of indignation or of mercy: for mercy was not, as the gentleman had alleged, the prerogative of the jury; mercy towards criminals was the prerogative of the president of the United States; to him, under our constitution, and to him alone, belongs the power of reprieve and pardon. The jury had sworn to try the cause according to the evidence: to whatever conclusion, therefore, the evidence conducted them, that conclusion was to be their verdict; they had no alternative—they could make no compromise with their consciences; they had only to discharge, with inflexible firmness, that duty which the laws of their country had confided to them, and when the question of mercy came before the president, there could be no doubt that he would discharge *his*

BALTI-
MORE,
May, 1818.

United States
v.
Hare.

with equal fidelity. When that question shall come before him, if ever it shall come, he will remember that mercy, however amiable in itself, degenerates into weakness, and even into guilt, where it is improperly directed. He will remember that there is a mercy due to society as well as to individuals, that the proper object of mercy is, either suffering virtue or penitent guilt; penitent guilt, which presents a well-founded hope of reformation; he will remember that a penitentiary is not always a place of repentance; that there have been persons who have been once, twice, thrice, and four times sentenced to that species of confinement, to whom it has proved no school of reform, who have applied the hours of their solitude to no other purpose than to sharpen their wits in projecting new schemes of rapine, and who have come forth into society only the more hardened in guilt, and the better prepared to carry on their depredations on a broader, bolder, and more daring scale. There are such men, (we do not say the prisoner is one,) there are men, we all know, so perfectly dead to every touch of virtuous feeling, so obdurate and stubborn in guilt, and so perversely proud of the success of their crimes, as to set at nought all obligations human and divine, and to laugh not only at the whip of the law, but even at the thunder of heaven. What mercy would there be to the virtuous part of society, in letting loose upon them men (if such monsters can deserve the name of men) of this description? These remarks, he said, were drawn from him against his purpose, by the unexpected course pursued by the gentleman to whom he was replying. Adverting again to the instruction prayed for, he said the question before the court was simply one of law; that the counsel for the prosecution had embodied their construction of the act in the prayer which they had addressed to the court; that they sought only to relieve the jury from the perplexity of a legal inquiry, to which they could not be supposed to be so competent as the court, and that they should be perfectly satisfied with any instruction as to the law, which the court should think proper to give the jury. The court would observe, that there were three counts in the indictment; the two first of which embraced the construction given to the act, by the counsel for the prosecution; the third count was founded on that construction, which was advocated on the other side, so as to leave the jury at liberty, under the instruction of the court, to find the prisoner guilty under either or all the counts, or not guilty at all, according to their view of the evidence; and as I do not propose to address them, I will only add, that whatever verdict they can reconcile to their consciences, will be satisfactory to us, content, as we shall be, with having done our duty.

After Mr. Wirt had closed his observations, the court charged the jury upon the law, and gave their opinion in support of the prayer submitted to them by Mr. Kell; the jury retired to their chamber, where they remained near two hours, when they desired some legal advice from the court, for which purpose they returned to their box; they observed, that the indictment set forth that the prisoner had pistols and dirks, and it was not in evidence that he had a dirk. The court stated their opinion to be, that if the party were armed with pistols and dirks, it was immaterial whether they were in the hands of the prisoner.

One of the jury then asked Mr. Ludlow if any threats were used. He   BALTI-
answered there were in case any resistance should be offered.   MORE,
    The jury then, without again leaving the box, delivered their verdict  May, 1818,
GUILTY *on all the counts in the indictment.**

United States
   *On the trial of John Alexander and Lewis Hare, the two other mail      v.
robbers, who were charged with robbing the mail in company with John    Hare.
Thompson Hare, and were immediately tried and convicted on all the
counts of a similar indictment, the same defence was made, and the court
laid down the law as in the preceding case. See their trials, post.